CARNEY BATES & PULLIAM, PLLC
Allen Carney
acarney@cbplaw.com
David Slade
dslade@cbplaw.com
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
Tel: 501-312-8500

*JUDGE KEENAN*

**14 CV     7582**

THE LAW OFFICE OF THOMAS M. MULLANEY
Thomas M. Mullaney (TM 4274)
tmm@mullaw.org
489 Fifth Avenue, Suite 1900
New York, NY 10017
Tel: 212-223-0800

Attorneys for Plaintiff Tropical
Sails Corp., on behalf of
itself and all others
similarly situated.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

TROPICAL SAILS CORP.                    )   Case No.:
                                        )
                   Plaintiff,           )   **CLASS ACTION COMPLAINT**
                                        )
        vs.                             )   **JURY TRIAL DEMANDED**
                                        )
                                        )
YEXT, INC.                              )
                                        )
                   Defendant            )
                                        )
                                        )
                                        )
                                        )
                                        )
_____ )

*RECEIVED*
*SEP 18 2014*
*U.S.D.C. S.D.N.Y.*
*CASHIERS*

**COMPLAINT**

Comes now the Plaintiff, Tropical Sales Corp. ("Plaintiff"), acting individually and on behalf of all other persons similarly situated, for its Complaint and demand for jury trial states and alleges as follows:

## INTRODUCTION

1.      Defendant Yext, Inc. ("Defendant," or "Yext") is an online marketing company that purports, for a recurring annual fee, to allow small businesses to ensure the accuracy of information such as their business name, address, phone number, website, and business type across over 50 "leading" Web directories.   However, Yext's business model is premised on deception.   Specifically, when communicating with a prospective customer, Yext intentionally misrepresents the amount of inaccurate information that exists on the World Wide Web relating to the customer's business and grossly overstates the efficacy of its service.  In short, Yext sells a solution to a problem that does not exist.

2.      Defendant's deception is accomplished in a two-step process. First, a customer visits Defendant's website and enters its business name and phone number, purportedly to determine whether any inaccuracies exist "across the internet" concerning the business.   Upon submitting this information, Defendant informs the customer that scores (indeed, routinely 100+) of "Location Data Errors" about its business proliferate.   In reality, many of these "Location Data Errors" have no bearing on the accuracy of a business's listings information "across the internet," but instead are false positives triggered because the customer has not purchased Yext's services. In other words, if the prospective scanned business is not already a Yext subscriber, the Yext scan is engineered to always show that scores of "errors" plague the business's Internet listings.

3.      Second, shortly after the deceptive scan, Defendant's telemarketers follow up with an aggressive sales call in which the telemarketer is instructed to misinform the customer in order to make a sale.  As one former employee stated: "They encourage lying to people to make a sale because after you get their credit card you will never contact that person again."

4.      Once customers purchase Yext's services, they quickly learn that what was promised was greater than what was received.  Many of the Web directory partners of Yext are valueless sites that fail to even return customers' listings when searched, and many of the purported "errors" did not exist in the first place.  In reality, the customer learns, Yext has been paid to fix nonexistent problems.

5.      Yext's deceptions – inflating the number of informational errors relating to a prospective customer's business and employing misleading telemarketers – create a misimpression in the prospective customer of the need for Yext's services. In fact, the services provide little value.  Such deceptions are fraudulent and are violations of N.Y. Gen. Bus. Law §§ 349 & 350.

6.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the PowerListings service ("PowerListings") from Yext. Defendant's representations regarding customers' need for and the benefits of PowerListings were deceptive.  Plaintiff seeks injunctive relief, statutory damages, compensatory damages, restitution, disgorgement, and recovery of attorney's fees and litigation costs.

## PARTIES AND JURISDICTION

7.    Plaintiff Tropical Sails Corp. is a corporation organized under the laws of Texas and specializing in facilitating cruises in locations throughout the world.  It operates a sales office out of Surprise, Arizona.

8.    Defendant Yext, Inc. is a Delaware corporation headquartered at 1 Madison Avenue, New York, New York.  In 2013, Yext's revenue was $33.8 million.  Yext's projected revenue for 2014 is $55 million.

9.    The Court has subject-matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A). The Court has personal jurisdiction over Defendant because it owns and operates businesses that are headquartered in New York and conducts substantial business throughout New York.

10.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Yext is headquartered in this district.  Further, the acts giving rise to this Complaint were executed in New York: Defendant's deceptive scheme was designed in New York, Defendant's telemarketers place their calls from a call center in New York (and utilize New York numbers), all customer communications are routed through Defendant's New York offices, and Defendant's New York employees take and process customer payments.

## FACTUAL BACKGROUND

11.    The marketing of businesses in the modern economy relies heavily on establishing a presence on the Internet.  This reality applies with equal force to both multinational corporations and local merchants, as potential customers commonly search for

goods and services on the World Wide Web (the "Web").  Accordingly, maintaining a presence on the Web is vital to marketing small businesses.  Indeed, a March 2011 Forbes article cited multiple studies showing that prospective customers overwhelmingly – 80% of the time – rely on Internet searches (primarily Google) when seeking out local services or goods.[1]  An April 2013 Forbes article cites research finding even that number has climbed: now, 97% of consumers conduct their searches for local businesses online.[2]

12.     Yext portrays itself as a "leading local advertising technology company dedicated to bringing the power of Internet advertising to all local businesses."[3]  Its primary product is the PowerListings service. Yext markets four separate PowerListings packages, ranging in price from $199 per year to $999 per year.  *See* attached Exhibit A.  Upon information and belief, the vast majority of PowerListings packages sold are the $499-per-year "Complete" package.

### A.  Yext's Website Urges Businesses to "Scan" Various Web Directories for Listing Accuracy, But Returns Deceptive Results

13.     At all times relevant to this litigation, Yext's website has contained a box urging visitors to enter their business's name and telephone number:[4]



---

[1] Kern Lewis, *Should Small Businesses Still Book Yellow Page Ads?*, Forbes (Mar. 28, 2011) (available at http://www.forbes.com/sites/kernlewis/2011/03/28/should-small-businesses-still-book-yellow-page-ads/).
[2] Tim Devaney and Tom Stein, *Your Business Needs to Get Social, Local and Mobile – Fast*, Forbes (Apr. 16, 2013) (available at http://www.forbes.com/sites/capitalonespark/2013/04/16/your-business-needs-to-get-social-local-and-mobile-fast/).
[3] *See* http://www.mediabistro.com/abm/joblistings/jobview.asp?joid=115895&igid= (last visited July 14, 2014).
[4] www.yext.com

CLASS ACTION COMPLAINT

14.     When the user completes or submits either iteration of the above form, Yext purportedly checks the supplied information against the records of its partner directories to determine whether the scanned business is accurately listed with those directories.   However, unless the business has a pre-existing Yext account, the result invariably identifies numerous purported errors across the purportedly scanned directories.   At some point prior to August 27, 2014, Yext represented these errors as "Location Data Errors," as follows:



15.     As of at least August 27, 2014, Yext first presents the total number of errors as an "Error Rate" with the warning that "[X]% of the time customers search for you, they will see incorrect information!"



16.     If the prospective consumer scrolls down to tally all of the purported errors, a banner pops up at the top of the screen, quantifying the precise number of purported errors:



17.     In both iterations of the scan, even where a business's name, address, and phone number are correctly listed with the Web directories that Yext purports to search, Yext will represent as "Location Data Errors" that listings are "Not Standing Out" and that the listing

is that of an "Unverified Business." But these "Data Errors" have no actual bearing on the accuracy of the business's listing on any of these directories. Instead, Yext has purposefully engineered the scan to show these "errors" for any business that has not signed up for Yext's PowerListings service. Indeed, a scan for **Yext itself** returns hundreds of "errors." *See* attached Exhibit B.

18.　　For instance, "Not Standing Out" does not actually mean that there are any factual inaccuracies or deficiencies in the business listing, but instead only means that the business has not published any content to the Web directory at issue *via Yext*. Yext purports to fix this nonexistent "error" by facilitating the publishing of additional items of information and/or media to business listings (photographs, video, etc.):

### Stand out and look great with Enhanced Listings

Add Photos, Descriptions, Promotions, to your listings on each site on our network. Let your customers know about specials, new products, important announcements, changing hours, or anything else. Simply enter the information into your PowerListings account and watch updates occur across the network at blazing fast speeds.[5]

But even if a business has already placed photographs, descriptions, or promotions on a Web directory listing, if that business is not a Yext customer, the scan result will display the "Location Data Error" of "Not Standing Out" for each of the listed Web directories. Put another way, unless a PowerListings customer conducts the scan, there will *always* be a representation that "Location Data Errors" exist, even if a business has a factually accurate listing, populated with photos, descriptions, promotions, and other content, in every single Web directory that Yext lists in its scan.

19.　　Similarly, Yext has engineered the scan so that an "error" is shown under the "Status" column for every web directory whenever the business is not a PowerListings customer.

---

[5] http://www.yext.com/pl/yext-powerlistings-official-site/what.html (Prior Website)

A common "error" in this column is "Unverified Business." "Verification" of a local business listing generally means that the business owner creates a specific account with the Web directory at issue, thereby "claiming" her business with the Web directory. This process—which in most cases the business may accomplish on its own by communicating with the Web directory—permits the business owner (rather than third parties such as customers) to control the content of the listing such as hours and location.[6]

20.     An "Unverified Business" does *not* actually mean that the business listing is incorrect. It is instead a misleading term from Yext's lexicon.  Indeed, Defendant reports as "unverified" listings that have perfectly accurate information. By reporting a listing as "unverified," Defendant really means that the potential customer has not used the PowerListings service to "claim" and thereby control its listings.

21.     Moreover, "Unverified Business" does not mean that the business has failed to claim its listing with the directory in question. Defendant's scan is engineered to return an "Unverified Business" prompt even if the business has previously claimed its listing on its own. "Unverified Business" really means that the listing has not been claimed through Yext, not that it has not been claimed at all.

22.     By way of a specific example, consider Facebook. Facebook permits business owners to independently verify their listings. To do so, the business owner must either submit an email with the business as the domain name (*e.g.*, joe@tropicalsails.com) or submit a copy of an official document showing the business name and address.[7] Because many small businesses do

---

[6] For example, Bing informs businesses, "Chances are Bing already has listings for your business. Claim it to take control of your listing on Bing." *See* https://www.bingplaces.com/ (last visited July 1, 2014). In some instances, a business cannot claim a listing on its own because the directory forces it to pay for the listing through Yext. MapQuest is one such directory. *See* https://listings.mapquest.com/apps/ (last visited July 16, 2014).
[7] *See* https://www.facebook.com/help/257661877677443/ (last visited July 16, 2014). Additionally, Facebook offers to "verify" a user's page if the user is a widely known celebrity or business. *See* https://www.facebook.com/help/196050490547892 (last visited July 16, 2014).

not have customized domain names, their only option is to submit documentation. But Yext cannot perform this service because it does not have access to these personal documents. While Yext can share a customer's data with Facebook,[8] it cannot claim the customer's page. The customer's listing is only "unverified" because the customer has not enlisted Yext to share its information with Facebook.

23.     In sum, Defendant uses its error prompts on its business scan to overstate and misrepresent the deficiencies in a potential customer's local business listings.  If the scanned business is not a PowerListings customer, Yext has purposefully engineered the scan to always denote that the business is "unverified" at every website (or has some other error under "Status" column)[9] regardless of whether the business owner has claimed or verified the listing at the website directory independent of Yext.  Indeed, where the business has independently claimed its listing, the "Unverified Business" prompt is an outright fabrication.

24.     Further, as discussed in Section B, *infra*, the true purpose of having the business owner enter his or her telephone number to run the scan is to immediately follow up the misleading scan with a high-pressure telemarketing sales call.

25.     Thus, the representations made by the "Scan Your Business" interface, and the subsequent search results demonstrating errors across myriad Web directories, are grossly deceptive for three reasons:

26.     First, the number of "Location Data Errors" identified by the scan bears no relation to whatever listing information is on any Web directory at any given time. Instead, Yext

---

[8] Defendant promotes "Yext Sync for Facebook," which allows the user to update a Facebook listing without claiming a Facebook page through the process described above. *See* http://www.yext.com/blog/2013/05/introducing-yext-sync-for-facebook/ (last visited July 16, 2014).

[9] "Not Standing Out" and "Unverified Business" are the most prominent of Defendant's error prompts. Others include "Different Business Name," which may appear if the Web directory does not list the business name exactly as it appears on other directories. Minute differences are enough to trigger the "Different Business Name" prompt. Additionally, the scan uses a "Wrong Phone Number" prompt even when the business's number is listed correctly.

engineered the scan to make the misrepresentation to business owners that scores (routinely 100+) of factual inaccuracies about their businesses proliferate across the Web.

27.    Second, Yext's primary purpose in providing the "Scan Your Business" interface is to obtain a prospective small business customer's telephone number. A Yext telemarketer then follows up with an aggressive sales call that misrepresents the benefits of PowerListings and, once again, the number of errors about the business currently on the web. *See* Section B, *infra*.

28.    Third, even if a small business owner does purchase the PowerListings service, across a sizeable percentage of Yext's "partner" directories, the business's listing will either be unfindable based upon *any* type of search, or it will be unfindable based upon searches by business category. *See* Section D, *infra*.

29.    Yext, aware of these facts and aware of the limited value PowerListings provides to most of its customers, nonetheless instructs its marketing department to say whatever it takes in order to push unsuspecting business owners into purchasing expensive PowerListings subscriptions that yield little, if any, return on investment.  As one former employee states: "They encourage lying to people to make a sale because after you get their credit card you will never contact that person again."[10]

### B. Yext's Aggressive and Misleading Telemarketing Campaign

30.    Many operators in the local-search marketing industry, including Yext, suffer from a phenomenon called "churn." Churn is the process by which customers quickly realize what they've paid for is not what they were promised, become dissatisfied, and terminate the

---

[10] Employee review, "Looking for a career? Yext is NOT your place!!!!" (Oct. 25, 2013) (available at http://www.glassdoor.com/Reviews/Employee-Review-Yext-RVW3230545.htm).

service.  Studies have shown that firms catering to the local-search market churn from 50% to as much as 90% of their clients every 6 months.[11]

31.    Among other companies in this space, Yext has been identified as having a "[r]eputation of being very sales focused with [a] high churn rate."[12]  Thus, rather than focusing on customer satisfaction and retention, the business model for Yext is to get as much in up-front fees from new customers as possible, with the knowledge that most if not all of those customers will become dissatisfied and cease paying for the service at the earliest opportunity (note that PowerListings is paid for in annual installments).

32.    For example, the website Glassdoor – an online database of company reviews written by employees – has multiple testimonials from current and former Yext employees detailing a culture built around high-pressure sales tactics and supplying misinformation to prospective customers.  These employees summarize their experience as follows:

- You will be a telemarketer doing non-stop cold calls from 8:30am-7pm (YES! Including your lunch hour). They will say that it is not cold calling because people come to the site, but nobody will know what the product is when you call them. They encourage lying to people to make a sale because after you get their credit card you will never contact that person again.[13]

- Sales associate [sic] are expected to make at least 150 calls/day and have 4 hours of talk time. And you are basically repeating the same sales script all day, over and over and over again.[14]

- All cold calling. Says leads are generated but all that means is they went to the website. You are talking to small business owners all day who have no idea what you are talking about when you call them.[15]

---

[11] Dennis Yu, "Evolve or Die: 2010 Local Ad Agency Fiscal Models." *Aim Clear Blog* (Jan. 5, 2010) (available at http://www.aimclearblog.com/2010/01/05/2010-local-ad-firm-model-changes/) (citing Borrell Research, "Economics of Search Marketing." (Jun. 2009) (available at https://www.borrellassociates.com/industry-papers/archives/economics-of-search-marketing-jun-09-detail)).
[12] Myles Anderson, "Local Citation Services Compared – MozLocal vs. BrightLocal vs. Yext vs. Whitespark vs. UBL." BrightLocal Blog (May 27, 2014) (available at http://www.brightlocal.com/2014/05/27/mozlocal-vs-yext-vs-ubl-vs-brightlocal-vs-whitspark/).
[13] Employee review, "Looking for a career? Yext is NOT your place!!!!" (Oct. 25, 2013) (available at http://www.glassdoor.com/Reviews/Employee-Review-Yext-RVW3230545.htm).
[14] *Id.*

CLASS ACTION COMPLAINT

- They don't want you to learn too much about the product, just say as little as possible and get that CC, then hang up. Hope they don't call back.[16]

- Managers encourage you to lie about what the product will do if it will get you the sale . . . . The few people that do buy over the phone are either [sic] confused as to what the product actually is. They end up canceling after the first year or much sooner.[17]

- Hated the boiler room feel to the sales.[18]

- Grueling job with a culture that is cut throat. High rate of turnover and employee dissatisfaction. Concerned with company goals and not employee satisfaction or growth. Condescending sales methods and approaches towards getting business' [sic] to buy their product. Could care less about anything but their bottom line.[19]

### C. Yext's Misrepresentations to Plaintiff

33.     On or about January 14, 2014, Plaintiff visited Yext's website and entered its business name and telephone number in the scanning interface described in paragraph 13.  Upon submitting this information, Plaintiff was directed to a results page substantially similar to the one in paragraph 14, indicating multiple "Location Data Errors."  Included among the listed errors was the representation that each listing, for each Web directory, was "Not Standing Out."

34.     On that same day, Plaintiff was contacted by a Yext telemarketer who asserted, among other things, that there were errors and inconsistencies in his business listings across Yext's network of Web directories.  The telemarketer promised that the PowerListings service would fix these inaccuracies (or create listings where there were none) and feature his business in Yext's partner Web directories whenever consumers conducted searches for comparable

---

[15] Employee review, "Good company. Cold Calling Sales Job." (Sep. 5, 2012) (available at http://www.glassdoor.com/Reviews/Employee-Review-Yext-RVW1922376.htm).
[16] Employee review, "Maybe sales isn't for me, but this place just seems downright foul." (Oct. 18, 2013) (available at http://www.glassdoor.com/Reviews/Employee-Review-Yext-RVW3199536.htm).
[17] Id.
[18] Employee review, "ok but not great." (Jan. 23, 2014) (available at http://www.glassdoor.com/Reviews/Employee-Review-Yext-RVW3576796.htm).
[19] Employee review, "I would give it no stars if allowed." (Oct. 7, 2012) (available at http://www.glassdoor.com/Reviews/Employee-Review-Yext-RVW2026029.htm).

businesses and services on those partner directories. Plaintiff subsequently enrolled in PowerListings on or about January 14, 2014, paying an annual fee of $499.00 by credit card.[20]

35.        Consistent with the instructions provided by Yext, on or about January 14, 2014, Plaintiff created a personalized template including, *inter alia*, its business name, telephone numbers, address, business type/category (to enable customer searches in Web directories), website address, and contact email.   PowerListings subsequently confirmed receipt of these changes.

### D.  Yext's Services Fail to Perform as Promised and Generate No Value to Plaintiff's Business

36.        Roughly four months after subscribing to the PowerListings service, Plaintiff logged into Defendant's Website and viewed a page titled "Listings," a feature of PowerListings enabling enrollees to view the status of their listings in the directories serviced by PowerListings. The information provided on the Listings page, as of 9:04 AM, Central Standard Time, on May 9, 2014, represented that listings had been published (*i.e.*, the listing was "Live") on all of the directories, with the possible exception of "Citybot" and "Local.com":

---

[20] As explained in paragraph 12, Defendant purports to provide tiered service offerings ranging from $199 (the "Emerging" plan) to $999 (the "Premium" plan).  *See* Yext Pricing Plans, Exhibit A.  Upon information and belief, Yext representatives will tell callers that there is a promotional offer wherein businesses may subscribe to the $999 Premium plan for $499.  This was the case for Plaintiff.

CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT



37.     Similarly, a scan conducted via Yext's website, utilizing Plaintiff's business name and telephone number, no longer returns a result claiming "Location Data Errors."

CLASS ACTION COMPLAINT

However, instead of purporting that no errors exist, the search result states that "This location has PowerLisings!" and that each Web directory listing is "PowerListings Synced."



38.        However, on many of the directories to which Defendant purports to provide Plaintiff's business listing, a search for Plaintiff or for businesses in Plaintiff's (1) geographical location and (2) area of business will *not* return a result with Plaintiff's listing, or else will be buried beneath many, many other listings.

39.        For example, on the site of one of Defendant's "leading publishers," EZLocal, a search near Surprise, Arizona (Plaintiff's city of business), for either "cruise," "travel," "cruise line," or even "Tropical Sails" will yield no result:

- "Travel" near Surprise, AZ:



- "Cruise" near Surprise, AZ:



- "Cruise Line" near Surprise, AZ



- "Tropical Sails" near Surprise, AZ:



40.      Exemplifying buried listings, on another of Defendant's Web directory

partners, AmericanTowns, Plaintiff's business will *ultimately* show up in a search for "travel"

near Surprise, AZ, but only below *68* other listings, many of which have no relation to the search

terms.  *See* Exhibit C (Screen grabs of search on AmericanTowns for "cruise" near Surprise, AZ).

41.     This latter point is critical, as research demonstrates that, of customers conducting searches for businesses, 91.5% choose from the first ten listings, and the rates drop precipitously after that.[21]  Indeed, while the first search result returned has a 34.35% likelihood of being clicked on by a customer, the twentieth search result has only a 0.29% chance of being clicked on by a customer.[22]  Thus, a "buried" listing is of almost as little value as no listing at all.

42.     Further, according to the "Listings" page on Defendant's PowerListings dashboard, Plaintiff's listing with the publisher Factual – a service Defendant describes as "[m]aking data more accessible for machines and developers"[23] – was still "Processing" as of June 22, 2014, *almost six months after Plaintiff signed up for PowerListings.*



<hr>

[21] Chitika Insights, "The Value of Google Result Positioning" (June 7, 2013) (report available at http://chitika.com/google-positioning-value).
[22] Todd Jensen, "Second Page Rankings: You're the #1 Loser." Gravitate Online (Apr. 12, 2011) (available at http://www.gravitateonline.com/google-search/2nd-place-1st-place-loser-seriously).
[23] http://www.yext.com/products/listings/factual/

CLASS ACTION COMPLAINT

43.      Defendant has consistently misrepresented the functionality and the benefits of the PowerListings service.   Such misrepresentations include, *inter alia*, statements made in Defendant's marketing materials and by Defendant's telemarketing sales representatives regarding the number and the extent of "Location Data Errors" present in a business's Web directory listings.   Further, any statements regarding the value of PowerListings are deceptive: at base, Defendant's product has only a small likelihood of providing any value to its customers as (1) the service does not work as advertised across a variety of Web directories and (2) many of the "leading publishers" to which Defendant sends listings are actually little-trafficked directories that Yext knows are unlikely to generate leads in the first place.

44.      The practice of overselling the value of directories has been noted by commentators.   One Web marketing professional notes in an article titled "Eight SEO[24] Scams That Won't Die" that consumers spend very little time conducting searches for products or services outside of a few well-known websites:

> How many search engines have you heard of?
>
> How many do you use on a regular basis (at least once per week)?
>
> You're not unique in this. Most people use Google – about 70% of people in this country as a matter of fact. Something like 20% use Yahoo!. 8% use Microsoft Live. Ask.com, Dogpile, Metacrawler, etc – the handful of remaining search engines collectively get about 2% of search traffic.
>
> There are not thousands of search engines to worry about. There are three. And if you're really pressed for resources, there is one – Google.[25]

45.      However, the quality of the misrepresented Web directories is not the only problem Plaintiff faces from PowerListings.   Even if a prospective customer foregoes the above-

---

[24] "SEO," or "Search Engine Optimization," is the practice of establishing one's website in the search results of search engines or web directories such as those Yext partners with.

[25] Mike Tekula, "8 SEO Scams That Won't Die," *Unstuck Digital* (Oct. 2011) (available at http://unstuckdigital.com/8-seo-scams/).

described search engines and utilizes one of Defendant's partner Web directories, as demonstrated in paragraphs 38–42, searches conducted in Plaintiff's area of business, in Plaintiff's geographical area, and even for Plaintiff's business name may not even return a result with Plaintiff's listing.

46.     Indeed, almost half a year after subscribing to Defendant's service, Plaintiff cannot trace a single lead or any other business benefit back to PowerListings.  To date, the product has grossly underperformed in comparison to the representations made by Defendant on its website and through its telemarketers.

47.     Ultimately, Defendant's conduct not only harms Plaintiff and Class Members, it also has the attendant effect of potentially harming the *customers* of Plaintiff and Class Members.  At minimum, the costs associated with Defendant's product add to the overhead of the small businesses Defendant purports to serve, which costs are in turn externalized either directly or indirectly to the customers of Plaintiff and Class Members.  Further, by virtue of Defendant's product failing to work as promised in multiple instances, potential customers of Plaintiff and Class Members are denied an "honest marketplace" in which they are afforded the full panoply of choices for vendors of goods and services.

48.     Not only were these misrepresentations made to Plaintiff but, as described throughout the Complaint, they were and remain part of a pattern and practice employed by Defendant to deceive small business owners throughout the United States.

## CLASS ACTION ALLEGATIONS

49.     This action is brought on behalf of Plaintiff, individually, and as a class action, on behalf the following class (collectively referred to as "the Class" or "Class"):

>All persons residing in the United States who purchased PowerListings.

50.     The Class does not include Defendant or its officers, directors, agents, or employees.

51.     Plaintiff reserves the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate.

52.     The members of the Class are so numerous that joinder is impractical.  Upon information and belief, the Class consists of thousands, the identity of whom is within the knowledge of Defendant and can be ascertained only by resort to Defendant's records.

53.     The representative Plaintiff's claims are typical of the claims of the members of the Class in that it, like all members of the Class, (1) maintained PowerListings accounts and (2) purchased Defendant's products and was not informed, at the point of sale, that the "services" did not perform as advertised.

54.     Questions of law and fact common to the Class predominate over questions that may affect individual Class members, including, *inter alia*:

>A.   Whether Defendant engineered its "Locations Error" scan to always denote numerous "Location Errors" if the business being scanned has not purchased PowerListings;
>
>B.   Whether Defendant engineered its "Locations Error" scan to always show an error for "Not Standing Out" if the business being scanned has not purchased PowerListings;
>
>C.   Whether Defendant engineered its "Locations Error" scan to always show an error (routinely "Unverified Business") under the "Status" column if the business being scanned has not purchased PowerListings;

D. Whether Defendant's scripts and training for sales calls include deceptive sales tactics and representations;

E. Whether Defendant sold PowerListings with knowledge that it would not perform as advertised;

F. Whether Defendant's conduct constitutes a deceptive trade practice;

G. Whether Defendant falsely advertised its products;

H. Whether Defendant fraudulently induced customers to purchase its products;

I. Whether Defendant was unjustly enriched;

J. Whether Plaintiff and members of the Class have sustained damages and, if so, what is the proper measure of those damages;

K. Whether injunctive relief is appropriate in this matter.

55.    Plaintiff will fairly and adequately represent and protect the interests of the Class in that it has no interest that is antagonistic to, or that irreconcilably conflicts with, those of other members of the Class.

56.    Plaintiff has retained counsel competent and experienced in the prosecution of class action litigation.

57.    A class action is superior to all other available methods for the fair and efficient adjudication of Plaintiff's and the Class members' claims. Plaintiff and the members of the Class have suffered irreparable harm as a result of Defendant's deceptive, intentional, reckless, negligent, and unlawful conduct. The damages suffered by individual Class members may be relatively small, and thus few (if any) individual class members can afford to seek legal redress on an individual basis for the wrong complained of herein. Absent a class action, Plaintiff

and members of the Class will continue to suffer losses as a result of Defendant's unlawful and negligent conduct.

## COUNT I
### Fraud/Fraudulent Inducement

58.     Plaintiff realleges and incorporates by reference all paragraphs above.

59.     Defendant's "business scan" does not reflect actual deficiencies in Plaintiff's or Class member's online listings. Instead, it has been programmed to produce these errors regardless of the state of Plaintiff's or Class members' Web presence. It reflects merely that a business has not employed Defendant's services.

60.     Defendant's misrepresentation about Plaintiff's Web presence (the "Business-Scan Misrepresentation") was material to Plaintiff's decision to purchase Defendant's services.

61.     Defendant knew that the "business scan" yielded false results and intended Plaintiff to rely on those results when determining whether to purchase PowerListings. In actual fact, the problems Defendant identified as inaccurate directory listings were, by-and-large, *manufactured* by Defendant through its misleading website and reinforced in its aggressive telemarketing follow-up. Defendant thus fraudulently induced Plaintiff and Class members to buy a useless service that they did not need, for purposes of fixing either a nonexistent or grossly exaggerated problem.

62.     Moreover, to the extent that Defendant's product provides any value, such value is so limited as to be nonexistent. For instance, a search for "cruise" or "travel" near Surprise, Arizona, would turn up Plaintiff's listing were Defendant performing as promised. Instead, this search reveals no listings or buried listings for Plaintiff across numerous Web directories, including EZLocal and AmericanTowns. Moreover, Plaintiff cannot trace any business benefit back to PowerListings. Defendant's misrepresentation of the need for its

services and the nature of its services (the "Product-Quality Misrepresentation") was material to Plaintiff's decision to purchase Defendant's service.

63.     Defendant, knowing that many of the purported "Location Data Errors" are nothing more than its own inventions, that there was nothing to fix in many instances, and that and the quality and effectiveness of many of its partner Web directories was and could continue to be less than what was promised, intended Plaintiff and Class members to rely on its misrepresentations when determining whether to purchase PowerListings.

64.     Reasonably relying on both the Business-Scan Misrepresentation and the Product-Quality Misrepresentation, Plaintiff enrolled in PowerListings by paying an annual fee of $499.00 to Defendant via credit card on or about January 14, 2014.

65.     As a result, Plaintiff was harmed. Specifically, Plaintiff paid Defendant money that it would not have paid but for Defendant's fraudulent misrepresentations about its product.

## COUNT II
### Unjust Enrichment

66.     Plaintiff realleges and incorporates by reference all paragraphs above.

67.     Plaintiff and all other Class members conferred benefits on Defendant by paying for PowerListings.

68.     Defendant knowingly and willingly accepted monetary payment from Plaintiff and the Class members after deceiving Plaintiff and the Class members into enrolling for PowerListings by displaying an inflated number of errors on its business scan and by employing deceptive telemarketing practices.  Indeed, Defendant could not have honored many of its purported obligations to correct inaccurate listing information, as the only inaccuracies were those fabricated by Defendant through its website.  Further, to the extent that Defendant did

populate Plaintiff's and the Class members' information to Web directories, many of these sites are of such poor quality as to be useless to Plaintiff and the Class members.

69.     Under the circumstances described herein, it is inequitable for Defendant to retain the monetary benefits derived from Plaintiff and the Class members.

70.     By engaging in the conduct described above, Defendant has been unjustly enriched at the expense of Plaintiff and the Class members. Accordingly, it would be contrary to principles of equity and good conscience to permit Defendant to retain any ill-gotten monetary benefits obtained as a result of the actions described herein.

71.     As a result of Defendant's enrichment, Plaintiff and the Class members have suffered injury and are entitled to reimbursement, restitution, and disgorgement by Defendant of the benefit conferred by Plaintiff and the Class members.

### COUNT III
### Violation of N.Y. General Business Law § 349—Deceptive Acts and Practices

72.     Plaintiff realleges and incorporates by reference all paragraphs above.

73.     Defendant designs its website to overstate the deficiency of a potential customer's web presence (and thus the need for Defendant's services). Defendant's claim that a potential customer suffers from scores if not hundreds of "Location Data Errors" is not a realistic portrayal of the potential customer's web presence. Instead, it means only that the potential customer has not employed Defendant. Defendant thereby materially misleads its potential customers.

74.     Defendant compounds this deception by failing to disclose that the true purpose of its "business scan" is to acquire the potential customer's phone number. Defendant uses that phone number to pressure the potential customer into purchasing its product. Failure to disclose the true purpose of the "business scan" is an additional materially misleading act.

75.     Once Defendant's telemarketing employee has the potential customer on the phone, the deception continues. At Defendant's direction, the telemarketing employee reemphasizes the supposed existence of "Location Data Errors" and promises that Defendant will fix the problem. Defendant encourages its telemarketing employees to say whatever it takes—including to misrepresent its services—in order to get the potential customer's credit card information. Defendant thereby materially misleads its customers.

76.     Defendant tops off these deceptions by failing to provide the listing services promised in its marketing materials. Six months after Plaintiff purchased Defendant's product, Plaintiff's information fails to show up on multiple platforms, contrary to Defendant's promises. By promising what it fails to deliver, Defendant materially misleads its customers.

77.     Defendant has directed its deceptive acts not only at purchasers of its products such as Plaintiff, but also at consumers throughout the United States.  Indeed, the deceptive conduct at issue in this case is not confined to a private contract dispute between businesses, but, rather, is based on a nationwide false marketing campaign directed at tens of thousands of potential customers, if not more.  The conduct complained of herein is not a private contract dispute, but rather it involves an extensive marketing scheme that has a broader impact on consumers at large.   Defendant's conduct not only has the potential to affect consumers, it has in fact impacted consumers.

78.     The deceptive transactions at issue here occurred in New York State. Defendant directs its deceptive representations about "Location Data Errors" over the web from its New York headquarters. It makes telemarketing calls to potential customers and signs up those customers via deceptive means from its headquarters in New York. When Plaintiff calls Defendant, it reaches its offices in New York. Defendant bills customers from its headquarters in

New York and receives the benefit of payment at its New York headquarters. Defendant uses no agent or intermediary, and all relevant transactions occur directly with Defendant in New York.

79.     Each of the materially misleading acts discussed above was willful or knowing. Defendant knew that it overstated the deficiency of Plaintiff's and other Class members' Web presence. It knew that the true purpose of the business scan was to acquire Plaintiff's and other Class members' contact information. It willfully directed its telemarketing employees to misrepresent the quality of the services to be rendered. And it promised to deliver knowing that it would fail to do so.

80.     Because of Defendant's deceptive acts, Plaintiff was harmed. Specifically, Plaintiff paid Defendant money that it would not have paid, but for Defendant's deceptions about its product.

81.     Plaintiff and each member of the Class are therefore entitled to (1) injunctive relief and (2) trebled actual damages up to $1,000. N.Y. Gen. Bus. Code § 349(h).

## COUNT IV
### Violation of N.Y. General Business Law § 350—False Advertising

82.     Plaintiff realleges and incorporates by reference all paragraphs above.

83.     Defendant advertises its services to consumers at large. As part of this advertising campaign, Defendant encourages consumers to conduct a "business scan." The "business scan" purports to show the consumer tens if not hundreds of "Location Data Errors," which Defendant promises to correct.

84.     These representations materially mislead consumers because they: 1) vastly overstate the deficiencies in consumers' Web presence; 2) fail to disclose that the primary purpose of the "business scan" is to obtain consumers' information; and 3) misstate the services that Defendant will actually provide.

85.     Defendant has directed its materially misleading representations not only at purchasers of its products such as Plaintiff, but also at consumers throughout the United States. Indeed, the conduct at issue in this case is not confined to a private contract dispute between businesses, but, rather, is based on a nationwide false marketing campaign directed at tens of thousands of potential customers, if not more.  The conduct complained of herein is not a private contract dispute, but rather it involves an extensive marketing scheme that has a broader impact on consumers at large.  Defendant's conduct not only has the potential to affect consumers, it has in fact impacted consumers.

86.     The deceptive transactions at issue here occur in New York State. Defendant directs its deceptive representations about "Location Data Errors" over the web from its New York headquarters. It makes telemarketing calls to potential customers and signs up those customers via deceptive means from its headquarters in New York. When Plaintiff calls Defendant, it reaches its offices in New York. Defendant bills customers from its headquarters in New York and receives the benefit of payment at its New York headquarters. Defendant uses no agent or intermediary, and all relevant transactions occur directly with Defendant in New York.

87.     Plaintiff reasonably relied on Defendant's false advertising. Specifically, Plaintiff would not have purchased the product had it known that the "business scan" vastly overstates the deficiencies in Plaintiff's online presence or that Defendant misrepresented the nature of the services to be provided.

88.     Each of the materially misleading acts discussed above was willful or knowing. Defendant intentionally overstated the deficiency of Plaintiff's and other Class members' Web presence, misstated the purpose of the business scan, and misrepresented the quality of the services to be rendered.

89.     Because of Defendant's deceptive acts, Plaintiff was harmed. Specifically, Plaintiff paid Defendant money that it would not have paid but for Defendant's deceptions about its product.

90.     Plaintiff and each Class member are therefore entitled to (1) injunctive relief and (2) trebled actual damages or statutory damages of five hundred dollars, whichever is greater. N.Y. Gen. Bus. Law § 350-e(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in favor of itself and the Class for the following:

A.     That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure; that Plaintiff is a proper class representative; and that the best practicable notice of this action be given to members of the Class represented by Plaintiff;

B.     That judgment be entered against Defendant and in favor of Plaintiff and the Class on the causes of action in this Complaint;

C.     That judgment be entered against Defendant finding that Defendant willfully or knowingly violated N.Y. Gen. Bus. Law § 349, granting injunctive relief, and awarding Plaintiff and each Class member three times actual damages or $1,000, whichever is less;

D.     That judgment be entered against Defendant finding that Defendant willfully or knowingly violated N.Y. Gen. Bus. Law § 350, granting injunctive relief, and awarding Plaintiff and each Class member three times actual damages or $500, whichever is greater.

E.     That judgment be entered against Defendant for injunctive and equitable relief, restitution, and compensatory damages in an amount to be determined at trial;

F.     That judgment be entered against Defendant imposing interest on damages;

       G.     That judgment be entered against Defendant imposing litigation costs and attorney's fees; and

       H.     For all other and further relief as this Court may deem necessary and appropriate.

     Plaintiff demands a jury trial on all issues so triable.


DATED:  September 18, 2014          Respectfully Submitted,

                         **CARNEY BATES & PULLIAM, PLLC**


                         By: /s/ Allen Carney
                         Allen Carney
                         acarney@cbplaw.com
                         David Slade
                         dslade@cbplaw.com
                         11311 Arcade Drive; Suite 200
                         Little Rock, Arkansas 72212
                         Tel: (501) 312-8500


                         **THE LAW OFFICE OF THOMAS M. MULLANEY**


                         Thomas M. Mullaney (TM 4274)
                         tmm@mullaw.org
                         489 Fifth Avenue, Suite 1900
                         New York, NY 10017
                         Tel: 212-223-0800

# EXHIBIT A

# yext

# Pricing Plans

Choose a PowerListings package to correct your listings across the internet.

| | Emerging $199 /year | Essential $449 /year | MOST POPULAR Complete $499 /year | Premium $999 /year |
|---|---|---|---|---|
| | PICK PLAN | PICK PLAN | PICK PLAN | PICK PLAN |
| Yahoo! | | ✓ | ✓ | ✓ |
| Facebook | | ✓ | ✓ | ✓ |
| Bing | | ✓ | ✓ | ✓ |
| Yelp | | ✓ | ✓ | ✓ |
| Whitepages | | ✓ | ✓ | ✓ |
| Superpages | | ✓ | ✓ | ✓ |
| Citysearch | | ✓ | ✓ | ✓ |
| Local.com | | ✓ | ✓ | ✓ |
| Foursquare | | ✓ | ✓ | ✓ |
| 32 Emerging Sites | ✓ | | ✓ | ✓ |
| Enhanced Content | | | ✓ | ✓ |
| Review Monitoring | | | | ✓ |
| Training Session | | | | ✓ |
| Tracking Analytics | | | | ✓ |

# EXHIBIT B

Yext PowerListings – Scan Your Listings                                              7/9/14 4:37 PM

# PowerListings Scan Results 



**Yext, (888) 444-2988** (Scan Another Business)

### This location has PowerListings!

Log in to your account to:
- Add PowerListings on more sites
- Check the status of your PowerListings
- Get PowerListings on more locations and more!



| | Business Name | Address | Phone | Special Offer | Status |
|---|---|---|---|---|---|
| **Yahoo!** view listing | Yext | 1 Madison Ave Fl 5TH | 8884442988 | Not standing out | Unverified Business |
| **Facebook** view listing | Yext | 1 Madison Ave Fl | 8884442988 | Not standing out | Unverified Business |
| **Bing** view listing | Yext | 1 Madison Ave Fl 5 | 8884442988 | Not standing out | Unverified Business |
| **Yelp** view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **WhitePages** view listing | Yext | 1 Madison Ave Fl 5 | 8884442988 | Not standing out | Unverified Business |
| **MapQuest** view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **Superpages** view listing | Yext | 1 Madison Ave Fl | 8884442988 | Not standing out | Unverified Business |
| **Citysearch** | | MISSING LISTING | | Not standing out | Not found |
| **Local.com** view listing | Yext | 1 Madison Ave Fl | 8884442988 | Not standing out | Unverified Business |
| **Foursquare** view listing | Yext | 1 Madison Ave Fl | 8884442988 | Not standing out | Unverified Business |
| **MerchantCircle** view listing | Yext | 1 Madison Ave | 8889218247 | Not standing out | Wrong Phone Number |
| **eLocal** view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **EZlocal** view listing | Yext | 1 Madison Ave Fl | 8884442988 | Not standing out | Unverified Business |
| **LocalDatabase** view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **ShowMeLocal** view listing | Yext | 1 Madison Ave Fl | 8884442988 | Not standing out | Unverified Business |
| **Topix** view listing | Yext | 1 Madison Ave Fl | 8884442988 | Not standing out | Unverified Business |

https://www.yext.com/pl/yext-powerlistings-official-site/scan.html

view listing

| | | | | | |
|---|---|---|---|---|---|
| **CitySquares**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **LocalPages**<br>view listing | Yext | 1 Madison Ave Fl | 8884442988 | Not standing out | Unverified Business |
| **MojoPages**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **Yellowise**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **YellowMoxie**<br>view listing | Yext | 1 Madison Ave Fl | 8884442988 | Not standing out | Unverified Business |
| **Tupalo**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **Avantar** | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **Co-Pilot** | Yext | 1 Madison Ave Fl | 8884442988 | Not standing out | Unverified Business |
| **Cricket** | Yext Inc | 1 Madison Ave # 5 | 2122433581 | Not standing out | Wrong Phone Number |
| **YellowBot**<br>view listing | Yext | 1 Madison Ave Fl | 8884442988 | Not standing out | Unverified Business |
| **MetroPCS** | Yext Inc | 1 Madison Ave # 5 | 2122433581 | Not standing out | Wrong Phone Number |
| **Navmii** | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **Where To?**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **ChamberofCommerce.com**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **USCity.net**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **YellowPageCity.com**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **AmericanTowns.com** | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **8coupons**<br>view listing | Yext | 1 Madison Ave | 8889218247 | Not standing out | Wrong Phone Number |
| **Factual**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **PennySaver**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **Yasabe**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **Pocketly**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |
| **GetFave**<br>view listing | Yext | 1 Madison Ave | 8884442988 | Not standing out | Unverified Business |

Yext PowerListings – Scan Your Listings                                                                 7/9/14 4:37 PM

| **GoLocal247** view listing | Yext | 1 Madison Ave | 8884442988 | **Not standing out** | **Unverified Business** |
| **Citymaps** | Yext | 1 Madison Ave | 8884442988 | **Not standing out** | **Unverified Business** |
| **Citybot** view listing | Yext | 1 Madison Ave | 8884442988 | **Not standing out** | **Unverified Business** |
| **YellowPagesGoesGreen** view listing | Yext | 1 Madison Ave | 8884442988 | **Not standing out** | **Unverified Business** |
| **Pointcom** view listing | Yext | 1 Madison Ave | 8884442988 | **Not standing out** | **Unverified Business** |
| **ABLocal** view listing | Yext | 1 Madison Ave | 8884442988 | **Not standing out** | **Unverified Business** |
| **Opendi** view listing | Yext | 1 Madison Ave | 8884442988 | **Not standing out** | **Unverified Business** |
| **VotefortheBest** view listing | Yext | 1 Madison Ave | 8884442988 | **Not standing out** | **Unverified Business** |
| **2findlocal** view listing | Yext | 1 Madison Ave | 8884442988 | **Not standing out** | **Unverified Business** |



Company     Privacy Policy     © 2014 Yext  All Rights Reserved     Made in NYC

# EXHIBIT C



















