**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------- X
TROPICAL SAILS CORP.,             :
                                  :
                 <u>Plaintiff</u>,     :
                                  :
    - against -                   :
                                  :
YEXT, INC.,                       :
                                  :
                 <u>Defendant</u>.     :
---------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 18, 2015

No. 14 Civ. 7582 (JFK)

**OPINION & ORDER**

<u>APPEARANCES</u>

FOR PLAINTIFF TROPICAL SAILS CORP.:
    Allen Carney, Esq.
    CARNEY BATES & PULLMAN, PLLC

    Thomas M. Mullaney, Esq.

FOR DEFENDANT YEXT, INC.:
    Gavin J. Rooney, Esq.
    Jewel Watson, Esq.
    LOWENSTEIN SANDLER LLP

**JOHN F. KEENAN, United States District Judge**:

Before the Court is Defendant Yext, Inc.'s motion to dismiss Plaintiff's putative class action complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Defendant's motion seeks dismissal on the grounds that (1) the complaint fails to allege consumer-oriented conduct as required to state a claim under sections 349 and 350 of the New York General Business law; (2) the complaint fails to allege fraud and fraudulent inducement with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure; and

(3) Plaintiff's claim for unjust enrichment is precluded by the existence of a contract between the parties.  For the reasons discussed below, Defendant's motion is denied, except that counts three and four of the complaint—which assert claims under New York General Business Law sections 349 and 350 for deceptive acts and practices and false advertising, respectively—are dismissed.

## I. Background

The following facts are taken from the allegations in the complaint and are accepted as true only for purposes of this motion to dismiss.  Plaintiff Tropical Sails Corp. is a small business located in Surprise, Arizona, which "facilitates cruises in locations throughout the world." (Compl. ¶ 7.) Defendant Yext is an online advertising company that assists businesses in monitoring whether their information is accurately listed on web directories. (Id. ¶ 1.)  Yext's primary product is the PowerListings Service, which is marketed as four separate subscriptions priced between $199 and $999 per year. (Id. ¶ 12.) Plaintiff alleges that the most popular of these is the $499-per-year "Complete" package. (Id.)

According to Plaintiff, Yext identifies potential customers through a free "Scan Your Business" search (hereinafter, the "business scan") offered on its website.  This search prompts visitors to enter their business's name and phone number in

2

order to compare that information against the records of Yext's partner web directories. (Id. ¶ 13-14.)  Visitors are then transferred to a results page showing any errors found in online listings associated with the visitor's information, such as that the listings are "Not Standing Out" or are of an "Unverified Business." (Id. ¶¶ 15-17.)  These errors are presented as either a total number of "Location Data Errors" or an "Error Rate" warning that "[X]% of the time customers search for you, they will see incorrect information!" (Id.)

Plaintiff asserts that the data errors identified by Yext's business scan do not have any actual bearing on the accuracy of a business's online listings; rather, Plaintiff alleges that the scan is deliberately engineered to show errors for any business that has not purchased Yext's PowerListings service. (Id. ¶¶ 17-20.)  Plaintiff also alleges that the primary purpose of the business scan is to provide Yext with the names and telephone numbers of visitors to its website so that Yext can follow up with sales calls about the PowerListings service.  According to Plaintiff, the telemarketers who make these calls are instructed by Yext to misrepresent both the benefits of PowerListings and the number of data errors found in Yext's partner web directories associated with the potential customer's business. (Id. ¶¶ 24-29.)  Because Defendant supposedly knows that these representations are false, Plaintiff contends that Yext's

business model is designed around "high-pressure sales tactics," rather than customer satisfaction and retention. (Id. ¶¶ 30-31.) Plaintiff therefore alleges that Yext's strategy is "to get as much in up-front fees from new customers as possible," on the assumption that most will become dissatisfied and cancel their PowerListings subscription at the earliest opportunity. (Id.)

Consistent with the allegations concerning Yext's general business practices described above, Plaintiff states that it first visited Yext's website on or about January 14, 2014 and entered its business name and telephone number into the "Scan Your Business" search box. (Id. ¶ 33.) According to Plaintiff, it was then directed to a results page indicating the existence of multiple "Location Data Errors," including that each identified listing was "Not Standing Out." (Id.) That same day, a Yext telemarketer purportedly contacted Plaintiff, claiming that there were errors and inconsistencies in Plaintiff's business listings "across Yext's network of Web directories" and promising that PowerListings would "fix these inaccuracies . . . and feature [Plaintiff's] business in Yext's partner Web directories whenever consumers conducted searches for comparable businesses." (Compl. ¶ 34.) Following this call, Plaintiff purchased the "Complete" PowerListings package for an annual fee of $499. (Id.)

4

Roughly four months later, Plaintiff states that it again checked the status of its online listings through the business scan on Yext's website and through a review page provided as part of Plaintiff's PowerListings subscription. (Id. ¶¶ 36-37.) In both instances, the results showed that Plaintiff's listings had been published across all of Yext's network of web directories—with the possible exception of the websites "Citybot" and "Local.com"—and that each directory was free from errors and was "PowerListings Synced." (Id.) However, despite the alleged promise by the Yext Telemarketer that PowerListings would fix inaccuracies in Tropical Sails' listings and feature Plaintiff's business in Yext's partner Web directories, Plaintiff contends a subsequent search for Tropical Sails on "EZ Local"—one of Defendant's partner web directories—returned no results when relevant search terms were entered. (Id. ¶¶ 38-39.) Similarly, another partner directory—"AmericanTowns"—listed Plaintiff's business beneath sixty-eight other listings, "many of which ha[d] no relation to the search terms." (Id. ¶ 40.)

On September 18, 2014, Plaintiff commenced this action by filing a class action complaint against Yext. On November 13, 2014, Defendant advised the Court that, in lieu of an answer, it had served Plaintiff with the present motion to dismiss. The motion was fully briefed on December 23, 2014 and oral argument was held on April 8, 2015.

5

## II. Discussion

### A.   Legal Standard

A motion to dismiss should be denied so long as the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Accordingly, in addressing a 12(b)(6) motion, a court must accept the plaintiff's allegations of fact as true and draw all reasonable inferences in the plaintiff's favor. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V., 4 F. Supp. 3d 395, 403 (S.D.N.Y. Aug. 25, 2014).

### B.   Analysis

Plaintiff brings this action under the Class Action Fairness Act of 2005, on the basis that the matter in controversy exceeds $5,000,000.00 and that some of the prospective class members are alleged to be citizens of states different than Defendant. See 28 U.S.C. § 1332(d)(2)(A).  The complaint asserts four causes of action against Defendant, including (count one) fraud and fraudulent inducement based on Yext's alleged use of false directory results and deceptive statements to mislead prospective customers; (count two) unjust enrichment to recover payments made by those customers to Yext

in reliance upon Yext's allegedly false statements; (count three) use of deceptive acts and practices to deceive consumers in violation of New York General Business Law section 349; and (count four) use of false advertising in violation of General Business Law section 350.  As discussed below, Defendant's motion to dismiss is granted with respect to Plaintiff's General Business Law claims under counts three and four, but is denied with respect to counts one and two.

    **1. New York General Business Law Sections 349 and 350**

Defendant seeks to dismiss Plaintiff's claims under New York General Business Law sections 349 and 350 on the ground that the complaint describes a purely business-versus-business dispute. (Pl.'s Mem. at 8-12.)  Sections 349 and 350 form part of New York's Consumer Protection Act and prohibit "deceptive acts or practices" and "false advertising," respectively. N.Y. GEN BUS. LAW §§ 349-50.  Although not explicitly stated in the text of either provision, courts have consistently found that the gravamen of a section 349 or 350 claim is "consumer injury or harm to the public interest." Securitron Magnalock Corp. v. Schnalbolk, 65 F.3d 256, 264 (2d Cir. 1995) (noting that section 349 is "at its core, a consumer protection device"); see also Maurizio v. Goldsmith, 230 F.3d 518, 522 (2nd Cir. 2000) (citing Securitron and noting that the same interpretation has been applied to section 350).  Consequently, a plaintiff asserting

7

claims under either section must charge conduct of the defendant that is consumer oriented. See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 24 (1995) (noting that a plaintiff must show that the complained-of conduct has "a broader impact on consumers at large").

In interpreting the consumer-oriented requirement of sections 349 and 350, however, New York state and federal courts have consistently distinguished between the meaning of "consumer" and the types of plaintiffs that may have standing to assert consumer-injury claims. See Beth Israel Med. Ctr. v. Verizon Bus. Network Servs., No. 11 Civ. 4509, 2013 WL 1385210, at *5 (S.D.N.Y. Mar. 18, 2013) (noting that the consumer-oriented requirement is satisfied "if the challenged conduct potentially affect[s] similarly-situated consumers" (quoting Oswego, 85 N.Y.2d at 26-27)).  With respect to the former, courts have defined "consumer" narrowly as an individual who 'purchases goods and services for personal, family or household use.'" Spirit Locker, Inc. v. EVO Direct, LLC, 696 F. Supp. 2d 296, 303 (E.D.N.Y. 2010) (citing authority from New York state appellate courts); see also U1IT4Less, Inc. v. FedEx Corp., 896 F. Supp. 2d 275, 295 (S.D.N.Y. 2012) (noting that this definition has repeatedly been applied to section 349 claims). At the same time, courts have permitted an expansive view of the types of plaintiffs who may have standing under sections 349 and

350. See Tasini v. AOL, Inc., 851 F. Supp. 2d 734, 743 (S.D.N.Y. 2012); see also Dollar Phone Corp. v. Dun & Bradstreet Corp., No. 09 Civ. 3645, 2010 WL 5313737, at *3 (E.D.N.Y. Sept. 2, 2010) ("Although the scope of [sections 349 and 350] is generally limited to claims by consumers, 'a business may bring a § 349 claim if it is harmed by consumer-oriented conduct.'" (quoting Spirit Locker, Inc., 696 F. Supp. 2d at 302)).

    Accordingly, a business may bring a claim under sections 349 and 350 where it is injured by conduct that is also directed at consumers or that causes harm to the public at large. See Spread Enters., Inc. v. First Data Merch. Servs., No. 11 Civ. 4743, 2012 WL 3679319, at *7 (E.D.N.Y. Aug. 22, 2012); see also Spirit Locker, Inc., 696 F. Supp. 2d at 303 ("[S]o long as the conduct is consumer-oriented, even a defendant's business competitor has standing to bring a claim under § 349, provided the competitor is incidentally harmed by the defendant's deceptive conduct."). By comparison, where the "activity complained of involves the sale of commodities to business entities only, such that it does not directly impact consumers," sections 349 and 350 are inapplicable. U1IT4Less, Inc., 896 F. Supp. 2d at 295; see also Dollar Phone Corp., 2010 WL 5313737, at *3 (explicitly rejecting the argument that a small business is a consumer under section 349); Cruz v. NYNEX Info. Res., 263 A.D.2d 285, 289 (1st Dep't 2000) (holding that the term

9

"consumer" did not encompass small businesses that purchase services available only to businesses).

Here, Defendant's alleged misconduct is targeted only at businesses. Plaintiff's seeks to avoid this conclusion by noting that Yext's potential customers include "[m]any individuals who have not incorporated—artists, landscapers, and bakers, for example." (Pl.'s Mem. at 15.) As discussed above, however, the distinction under New York law between an individual consumer and a business is not dependent on the use of a corporate form; rather, the issue is whether the product is purchased "for personal, family or household use." See Dollar Phone Corp., 2010 WL 5313737, at *3. Therefore, to the extent that artists, landscapers, and bakers purchase a product for personal, family or household use, Plaintiff is correct that they may be considered consumers. As alleged in the complaint, however, Defendant markets PowerListings to those who—like Plaintiff—"wish to sell their goods and services and to list themselves on a web directory." (Pl.'s Mem. at 15.) Such a product is, by its nature, directed only at businesses. See Cruz, 263 A.D.2d at 291 (noting that "advertisement space . . . is, by definition, a commodity available to businesses only"); see also Spin Master Ltd. v. Bureau Veritas Consumer Prods., No. 08 Civ. 923, 2011 WL 1549456, at *3-4 (W.D.N.Y. Mar. 7, 2011) (noting that defendant's services were not available to the

general public and holding that, to the extent plaintiff was attempting to assert claims as a consumer, it was "neither the type of 'consumer' that section 349 is intended to protect nor is the transaction at issue the type of 'consumer' transaction contemplated by the statute"). Accordingly, Defendant has not demonstrated that Defendant's alleged misconduct is directed at consumers.

Defendant's alleged misconduct also does not amount to a public harm. Plaintiff contends that Defendant's "deceptive sales tactics impact not only their small-business customers, but also individual consumers who rely on those small businesses." (Pl.'s Mem. at 21-23.) In so doing, Plaintiff asserts that the Court should follow decisions from other courts within the Second Circuit allowing businesses to assert claims under sections 349 and 350, on the basis that the defendants' deceptive conduct caused the plaintiff to incur additional costs that were passed on to consumers or unnecessarily diverted the plaintiff's attention from activities that would have better served the public interest. See, e.g., Allstate Ins. Co. v. Lyons, 843 F. Supp. 2d 358, 376 (E.D.N.Y. 2012) (noting that the defendants had "unlawfully stripped millions of dollars from Allstate, which has likely increased the premiums of consumers"); Securitron Magnalock Corp., 65 F.3d at 264 (concluding that "the harm to the public was manifest" where the

11

defendant gave false information to "the only city agency having jurisdiction to approve materials . . . for use in city construction projects," which "caused [the agency] to undertake unnecessary investigations and interfered with its decisionmaking process").

Plaintiff's allegations, however, lack the "certain, specific, and direct public impact" needed to support an inference of consumer-oriented conduct. See Beth Israel Med. Ctr., 2013 WL 1385210, at *7. According to the complaint, an annual subscription to PowerListings costs between $199 and $999 and "most if not all" of Yext's customers do not renew their subscriptions because of dissatisfaction with the service. (Id. ¶¶ 12, 31.) Unlike the millions of dollars ostensibly lost by Allstate in Lyons, therefore, the losses allegedly suffered by any one of Yext's customers are comparatively minor and are not "likely" to harm the public at large. See Lyons, 843 F. Supp. 2d at 376; see also Spread Enters., 2012 WL 3679319, at *8 (rejecting similar arguments and noting that, if this type of allegation were sufficient, then any conduct that causes a business to lose money could be construed as affecting consumers). Likewise, even if "depriv[ing] [consumers] of transparent online listings" and denying them the "fully panoply of choices for vendors of goods and services" could be sufficient to constitute a manifest harm to the public interest,

12

the complaint contains no allegations to suggest that accurate directory information for Plaintiff's business was not otherwise available to consumers online or that Defendant's conduct affected the quality of business listings on the "few well-known websites" that Plaintiff explains are generally used by consumers to search for products and services. (Compl. ¶¶ 43-47; Pl.'s Mem. at 23.)

Therefore, unlike the allegations of "direct governmental and consumer harm in Securitron and the massive and reverberating scheme in Lyons," the harm alleged by Plaintiff is too attenuated to establish that Defendant's conduct harmed the public, such that the consumer-oriented requirement of sections 349 and 350 would be satisfied.  See Beth Israel Med. Ctr., 2013 WL 1385210, at *7 (addressing a "routine case of overbilling" and concluding that allegations of "hypothetical harm" to the public did not provide a basis for a section 349 claim).  To conclude otherwise would stretch the scope of sections 349 and 350 beyond recognition. See Spread Enters., 2012 WL 3679319, at *8.  Consequently, Plaintiff's General Business Law claims under counts three and four are dismissed.

### 2. Plaintiff's Fraud-Based Claims

Defendant also requests that the Court dismiss count one of the complaint, on the basis that Plaintiff fails to allege fraud and fraudulent inducement with particularity. (Pl.'s Mem. at 12-

13

15.)  In order to state a claim for fraud and fraudulent inducement, a complaint must sufficiently allege (1) a material misrepresentation of fact by the defendant; (2) that the defendant intended to deceive the plaintiff; (3) that the plaintiff reasonably relied on defendant's misrepresentation; and (4) that the plaintiff was injured as a result. See Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 143 (2d Cir. 2011). Additionally, these facts must be pled with particularity under Rule 9(b), which requires that a plaintiff (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) indicate where and when the statements were made, and (4) explain why the statements were fraudulent. See Fed. R. Civ. P. 9(b); ATSI Commc'ns., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007); Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).  Because reliance is an essential element of fraud, it must also be pled with particularity under Rule 9(b). See Bank of Am. Corp. v. Braga Lemgruber, 385 F. Supp. 2d 200, 230 (S.D.N.Y. 2005).

   Here, Defendant does not directly challenge the complaint's allegations of materiality, intent, or damages.  Instead, Defendant seeks to dismiss Plaintiff's fraud-based claims on the ground that the complaint fails to sufficiently allege (1) any specific statement made to Plaintiff by Yext that was fraudulent or (2) that Plaintiff relied upon any such misstatement in

14

purchasing the PowerListings service. (Def.'s Mem. at 13.)  Upon review of the complaint, however, the Court concludes that Plaintiff's claim for fraud and fraudulent inducement is alleged with sufficient particularity under Rule 9(b).

First, Plaintiff plainly identifies the particular statements it contends were fraudulent, as well as the speaker, time, and place as required to plead a cause of action under Rule 9(b).  The complaint indicates that, on or about January 14, 2014, Plaintiff visited Yext's website and entered its information into the business scan. (Compl. ¶ 33.)  Plaintiff was then directed to a results page showing that multiple "Location Data Errors" related to Plaintiff's information had been found in Yext's partner web directories. (Compl. ¶ 33 (referring to this statement as the "Business-Scan Misrepresentation"); Pl.'s Mem. at 8.)  The complaint also specifies that Plaintiff was contacted by a Yext telemarketer that same day, who asserted that there were errors and inconsistencies in Plaintiff's online listings and promised that "the PowerListings service would fix these inaccuracies . . . and feature [Plaintiff's] business in Yext's partner Web directories whenever consumers conducted searches for comparable businesses." (Compl. ¶ 34 (referring to this statement as the "Product-Quality Misrepresentation"); Pl.'s Mem. at 8-9.)

15

Second, the complaint also explains why the Business-Scan and Product-Quality Misrepresentations were allegedly false—namely, because (1) the "Location Data Errors" reported by the business scan meant that Plaintiff did not have a PowerListings account and not, as Defendant's website supposedly represented, that incorrect information about Plaintiff's business had been found in Yext's partner web directories; and (2) that Yext falsely represented that PowerListings would fix inaccuracies in Plaintiff's listings and would feature Plaintiff's business in its partner directories. (Id. ¶¶ 17-20, 34-38.)  These assertions are further supported by specific factual allegations showing that, after Plaintiff purchased PowerListings, the business scan no longer reported any "Location Data Errors" for Tropical Sails and instead listed each directory as "PowerListings Synced." (Id. ¶ 37.)  According to Plaintiff, however, subsequent searches for its business on many of the "PowerListings Synced" directories—including EZLocal and AmericanTowns—either returned no results for Plaintiff's business or buried Plaintiff's listings beneath many other irrelevant listings. (Id. ¶¶ 38-40.)  Plaintiff therefore claims that Yext knowingly misrepresented that the business scan detected deficiencies in Plaintiff's online listings and that Powerlistings would fix these deficiencies and feature

Plaintiff's business in Yext's partner web directories. (Compl. ¶¶ 17, 34-38, 61-63.)

Finally, the complaint alleges that Plaintiff relied on Yext's misrepresentations in purchasing a PowerListings subscription. Specifically, Plaintiff states that it "enrolled in PowerListings . . . paying an annual fee of $499" and that, in doing so, it was "[r]easonably relying on both the Business-Scan Misrepresentation and the Product-Quality Misrepresentation." (Id. ¶ 34, 64.)

Viewed as a whole, therefore, the complaint alleges that Plaintiff actually purchased a specific subscription to PowerListings based on particular misrepresentations made to it by Yext, which is sufficient to state a claim for fraud at this stage of the proceedings. Compare Duafala v. Globecomm Sys. Inc., No. 13 Civ. 4944, 2015 WL 502233, at *7 (E.D.N.Y. Feb. 5, 2015) (finding that a fraud claim was sufficiently pleaded where the complaint identified specific misrepresentations made by the defendant to shareholders of a company and alleged that the shareholders relied on those misrepresentations in accepting the defendant's offer to purchase their shares); with Int'l Fund Mgmt. S.A. v. Citigroup Inc., 822 F. Supp. 2d 368, 386 (S.D.N.Y. 2011) (addressing securities fraud claims and noting that the complaint "lack[ed] supporting factual matter indicating how plaintiffs relied on the alleged misrepresentations").

17

Accordingly, Defendant's request to dismiss Plaintiff's fraud-based claims is denied.

### 3. The Availability of Quasi-Contract Remedies

Finally, Defendant asks the Court to dismiss count two of the complaint because Plaintiff's claim for unjust enrichment is precluded by the existence of a contractual relationship between the parties. (Pl.'s Mem. at 16-18.)  A party asserting a claim for unjust enrichment must demonstrate (1) "that the defendant was enriched at the plaintiff's expense" and (2) "that equity and good conscience require the plaintiff to recover the enrichment from the defendant." Giordano v. Thomson, 564 F.3d 163, 170 (2d Cir. 2009).

Generally, an unjust enrichment claim is not "available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790 (2012).  New York courts have, however, permitted an exception to this rule, such that "a claim for unjust enrichment is not duplicative of a breach of contract claim where the plaintiff alleges that the contracts were induced by fraud." Rodriguez v. It's Just Lunch, Int'l, No. 07 Civ. 9227, 2013 WL 1749590, at *5 (S.D.N.Y. Apr. 23, 2013) (quoting Pramer S.C.A. v. Abaplus Int'l Corp., 907 N.Y.S.2d 154, 161–62 (N.Y. App. Div. 2010)); see also Chigirinskiy v. Panchenkova, No. 14 Civ. 4410, 2015 WL 1454646, at *18 (S.D.N.Y. Mar. 31, 2015) ("[U]njust

18

enrichment may be pleaded in the alternative to breach of contract."). Moreover, a quasi-contract claim may be asserted, notwithstanding the existence of a contract between the parties, where the complained-of conduct falls outside the scope of that contract. See Lyons, 843 F. Supp. 2d at 376 (refusing to dismiss unjust enrichment claims because they were "predicated on conduct not covered by the contract" and "stem from defendants' misrepresentations").

Here, the complaint alleges (1) that Plaintiff enriched Defendant by paying $499.00 for PowerListings and (2) that it would be inequitable for Defendant to retain a sum that it induced by fabricating "errors" in Plaintiff's web presence and promising services that it knew it would not provide. (Compl. ¶ 66-71.) Moreover, Plaintiff has alleged that any agreement between the parties was induced by fraudulent representations made by Yext to Plaintiff. (Id. ¶ 33-34, 64.) Therefore, because the Court finds that Plaintiff has adequately stated a claim for fraudulent inducement, it is also entitled at this stage to maintain its claim for unjust enrichment, on the basis that any contract between the parties concerning Plaintiff's purchase of PowerListings might be found unenforceable. See St. John's Univ., New York v. Bolton, 757 F.Supp.2d 144, 183 (E.D.N.Y.2010) ("At the pleading stage, Plaintiff is not

19

required to guess whether it will be successful on its contract, tort, or quasi-contract claims," as it may be that "no valid contracts exist or that the breaches alleged by Plaintiff were not breaches of duties governed by the contracts."). Accordingly, Defendant's request to dismiss Plaintiff's claim for unjust enrichment is denied.

### III. Conclusion

For the foregoing reasons, counts three and four of the complaint—deceptive acts or practices and false advertising in violation of New York General Business Law sections 349 and 350—are dismissed. The remaining portions of Defendant's motion to dismiss are denied as set forth above. Counsel are directed to appear in Courtroom 20-C on May 28, 2015 at 11:30 a.m. for a conference to discuss certification of Plaintiff's putative class action.

**SO ORDERED.**

Dated:   New York, New York
         May 18, 2015

*/s/ John F. Keenan*
John F. Keenan
United States District Judge