UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------ X

TROPICAL SAILS CORP.,                :
                                     :
                   Plaintiff,        :
                                     :
        -against-                    :
                                     :
YEXT, INC.,                          :
                                     :
                   Defendant.        :

------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/17/2017

No. 14 Civ. 7582
**OPINION & ORDER**

APPEARANCES

FOR PLAINTIFF TROPICAL SAILS CORP.
    Joseph Henry Bates, III, Esq.
    James Allen Carney, Esq.
    David F. Slade, Esq.
    CARNEY BATES & PULLIAM, PLLC

    Thomas M. Mullaney, Esq.
    THE LAW OFFICES OF THOMAS M. MULLANEY

FOR DEFENDANT YEXT, INC.
    Gavin J. Rooney, Esq.
    Naomi D. Barrowclough, Esq.
    LOWENSTEIN SANDLER LLP

**JOHN F. KEENAN, United States District Judge:**

Plaintiff Tropical Sails Corp. (Tropical Sails) moves the
Court to certify a class pursuant to Federal Rule of Civil
Procedure 23(a) and (b)(3) to pursue claims of fraud and unjust
enrichment against Defendant Yext, Inc. (Yext).  Yext opposes
this motion and moves the Court to grant summary judgment in
Yext's favor pursuant to Federal Rule of Civil Procedure 56.
The Court denies Tropical Sails' motion for class certification
because Rule 23(b)(3)'s predominance requirement is not met and

1

denies Yext's motion for summary judgment because genuine disputes exist as to material facts.

## I.  Background

The following summary is drawn from Yext's Local Rule 56.1 statement, the parties' supporting documentation, and from the affidavits and records filed with regards to Tropical Sails' class certification motion.[1]  Unless otherwise noted, the summary is limited to the putative class period, which spans from November 2012 through July 2014.

Tropical Sails, a Texas corporation, is a small travel agency based out of the Surprise, Arizona home of its owner and sole employee, Daniel Oppliger. (Def.'s Loc. R. 56.1 Statement ¶ 1; Compl. ¶ 7.)  Its primary business concerns organizing and booking cruises and other tours. (Def.'s Loc. R. 56.1 Statement ¶ 2; Oppliger Dep. 38:2-39:18.)  Tropical Sails began in 1990 under the name Tropical Adventures, and incorporated in 1998

---

[1]  Tropical Sails did not file a Local Rule 56.1 counterstatement as required by Local Rule 56.1(b). See S. & E.D.N.Y. Loc. R. 56.1(b).  The court, therefore, could deem the facts set forth in Yext's Local Rule 56.1 Statement as admitted for Yext's motion for summary judgment. Id. R. 56.1(c).  But, because "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules" and because this Opinion & Order also addresses Tropical Sails' motion for class certification, the Court opts instead "to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement." Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) (quoting Monahan v. N.Y.C. Dep't of Corrs., 214 F.3d 275, 292 (2d Cir. 2000)).

under its current name. (Oppliger Dep. 17:1-19.)  In addition to print advertising and attending vendor fairs, Tropical Sails generates business by having a good internet presence. (Id. at 32:8-33:25.)  This involves listing Tropical Sails with about 500 search engines by filling out forms on the internet and optimizing its listings to appear on the first page of search engine results, so-called search engine optimization or SEO. (Id. at 33:6-35:4, 66:23-67:6, 90:6-91:4.)  Tropical Sails estimates that it has spent one to two hours per week over its lifetime managing its listings on the internet. (Id. at 35:3-37:6; Def.'s Loc. R. 56.1 Statement ¶ 10.)

Yext, a Delaware corporation headquartered in Manhattan, is an online marketing company whose primary product is its PowerListings service. (Pl.'s Mot. for Class Certification Ex. 1, at YEXT0000017; Compl. ¶¶ 8, 12.)  Yext describes PowerListings as "enhanced local listings on participating local search, mobile and directory sites." (Pl.'s Mot. for Class Certification Ex. 1, at YEXT0000017.)  Essentially, PowerListings enables its subscribers to track their business listing information (e.g., business name, address, and telephone number) across a number of online business directories—or internet Yellow Pages—that partner with Yext. (Id.)  Yext sees the "three primary benefits" of PowerListings to be: (1) "single point control," or the ability to manage, update,

3

and edit listings on multiple directories at one time in one central location; (2) "listing content enhancement," or the ability to add photos, videos, and special offers to listings; and (3) "increased rank," or higher visibility of a subscriber's listing to its potential customers. (Id. at YEXT0000017, 31, 52, 55, 174; id. Ex. 17, at YEXT0000769.)

To attract customers, Yext offers a free online business scan, which it describes as its "primary hook that shows businesses where they are listed incorrectly." (Id. Ex. 2, at YEXT0001440; Def.'s Loc. R. 56.1 Statement ¶ 6.)  The PowerListings scan asks a potential customer to input its business name and telephone number and, during the putative class period, purported to return results including a total of "Location Data Errors Detected" followed by an itemization of each online business directory's listing and the supposed "error," if any, that the scan detected. (Compl. ¶¶ 13-14; Shaw Dep. 13:9-19, 20:4-24:7.)  The "Location Data Errors Detected" total tallied errors specified in the itemized list below it, which consisted of six columns:  (1) the online directory displaying the listing (e.g., Yahoo!, Facebook, Bing, etc.) with a hyperlink to the business' listing on the online directory; (2) the potential customer's business name; (3) its business address; (4) its business telephone number; (5) a "Special Offer" column; and (6) a "Status" column. (Compl. ¶ 14; Shaw

4

Dep. at 13:9-19; Makhani Dep. 36:6-38:25.)  For customers not
already subscribed to Yext's PowerListings service, the
PowerListings scan reported "not standing out" under the
"Special Offer" column and "unverified listing" under the
"Status" column for every single online directory in the list.
(Makhani Dep. 37:19-39:6; Shaw Dep. 21:18-24:3.)  In addition to
totaling any entry missing entirely from a directory and any
discrepancy in the business name, address, or telephone number
as an error, the PowerListings scan counted each "not standing
out" and "unverified listing" as an error. (Makhani Dep. 37:19-
39:6; Shaw Dep. 21:18-24:3.)  The PowerListings scan contained
between forty and sixty online directories, meaning that for all
customers not subscribed to PowerListings at the time they ran
the PowerListings scan, by design, the scan showed at least
eighty to 120 errors. (Makhani Dep. 38:10-39:25.)  The
PowerListings scan encouraged potential customers to "Click here
to fix all [number] errors." (Compl. ¶ 16; see also Shaw Dep.
57:1-7.)  If customers did not subscribe to PowerListings
through the link, a Yext sales associate would use the telephone
number entered into the scan to place a sales call. (Pl.'s Mot.
for Class Certification Ex. 12, at YEXT0000625.)  Yext offers
four pricing plans for its PowerListings service. (Pl.'s Mot.
for Class Certification Ex. 34.)  It encourages potential
customers to "[c]hoose a PowerListings package to correct your

5

listings across the internet." (Id.)  These packages range from
$199 per year for the emerging package, which provides
subscribers listings management with thirty-two unspecified
emerging sites, to $999 per year for the premium package, which
offers subscribers listings management with all of Yext's
partner directories as well as enhanced content, review
monitoring, a training session, and tracking analytics. (Id.)
According to Yext's marketing materials, its most popular
subscription is the complete package, which costs $499 per year
and provides subscribers listings management with all of Yext's
partner directories and enhanced content. (Id.)

Tropical Sails ran the PowerListings scan a total of
twenty-two times on sixteen different days. (Pl.'s Mot. for
Class Certification Ex. 16, at YEXT0000569.)  Prior to
subscribing to PowerListings, Tropical Sails ran the scan
approximately eight times during the putative class period.
(Id.; Oppliger Dep. 63:23-64:18; Def.'s Loc. R. 56.1 Statement
¶¶ 7, 14.)  After running these scans, Tropical Sails would
click through the hyperlinks on the PowerListings scan's results
page and manually edit its listing on the online business
directory. (Oppliger Dep. 64:3-18; Def.'s Loc. R. 56.1 Statement
¶¶ 8-9.)  Tropical Sails then re-ran the PowerListings scan to
verify that the corrections appeared, but they did not.
(Oppliger Dep. 64:12-65:11.)

On January 14, 2014, Tropical Sails again ran the
PowerListings scan without subscribing to the PowerListings
service. (Id. at 65:12-17.)  This time, however, Tropical Sails
subscribed to the PowerListings service after receiving a
follow-up sales call from a Yext sales associate. (Id. at 63:15-
22, 65:3-17, 66:5-68:2; Def.'s Loc. R. 56.1 Statement ¶ 15.)
Yext deposed Oppliger on December 1, 2015, and as best as he
could recall, on the sales calls following his January 14, 2014
scan, Yext's sales associate advised Oppliger that the
PowerListings service "would update [his listings] across all
platforms.  You would get, like, pictures and photos across all
platforms.  People are using these directories.  A little video
would be spread across some platforms.  I could keep [the
listings] updated with an app on my phone." (Oppliger Dep.
66:14-20.)  The sales associate also told Oppliger that the
PowerListings service would help with Tropical Sails' search
engine optimization because his "listings will be correct.
You'll have the pictures, and the description will have more
weight than just a plain [one]." (Id. at 66:21-67:6; accord id.
67:19-22; Def.'s Loc. R. 56.1 Statement ¶ 17.)  Finally, the
sales associate told Oppliger that PowerListings would add
Tropical Sails to "several directories that have an audience
people use, without having to have a contract . . . , without
having to call and have a deal with Yelp or with Four Square."

7

(Oppliger Dep. at 67:7-13.)  In other words, PowerListings would substitute for the several hours per week Tropical Sails spent manually managing its listings. (Id. at 67:14-18.)

Oppliger testified that he waited to subscribe to the PowerListings service until he received a sales call because he had questions about the PowerListings scan's results page and he wanted an explanation from a Yext sales associate of the benefits of PowerListings and how he would "be on all these platforms that a lot of people use that I'm not aware of." (Id. at 98:10-25.)  Oppliger asked the sales associate why his manual corrections did not show up on the PowerListings scan, and the sales associate told him that there are "delays in corrections." (Id. at 65:3-7.)  Ultimately, Oppliger testified that seeing the errors in the PowerListings scan's results page induced him to subscribe to PowerListings service. (Id. at 98:22-25.)

Oppliger also testified that he subscribed to the PowerListings service because

> I liked the fact that I get the pictures across all these directories, and I was led to believe these directories had an audience that I wasn't reaching. . . .  It would save me time. . . .  [g]oing into hundreds of directories and entering all the data.  There are 500 directories.  I forget how many directories Yext has."

(Id. at 69:6-14; accord Def.'s Loc. R. 56.1 Statement ¶ 18.) Oppliger could not recall seeing the sum of location data errors

detected, (Oppliger Dep. 61:2-5, 66:1-4; Def.'s Loc. R. 56.1
Statement ¶ 13), but he did remember manually checking some of
the listings and seeing the "Special Offer" and "Status" columns
showing errors. (Oppliger Dep. 61:6-11, 99:11-100:5.)

Oppliger took advantage of the services that PowerListings
offered. (Def.'s Loc. R. 56.1 Statement ¶ 20.)  First, he had a
training session with Yext to learn how to use the PowerListings
service. (Oppliger Dep. at 71:2-22.)  He added biographies of
Tropical Sails, himself, and his two daughters who sometimes
helped in the business. (Id. at 71:12-20.)  He posted about
forty pictures when he first created his PowerListings profile.
(Id. at 71:23-72:23.)  He downloaded the Yext app for his phone
and used it to post pictures from the vendor fairs he attended.
(Id. at 73:6-74:6.)  He put up special offers like a free
airport shuttle coupon with qualifying purchase. (Id. at 74:7-
75:8.)  He monitored customer reviews of Tropical Sails and used
Yext to spread customer reviews across multiple directories.
(Id. at 77:6-78:2.)  He posted a short video about Tropical
Sails. (Id. at 84:20-85:15.)  And, finally, Tropical Sails
appeared on new directories. (Id. at 79:2-82:8, 85:16-86:17.)

In some senses, the PowerListings service worked:  Tropical
Sails' pictures appeared on all of Yext's partner directories
and it saved Oppliger time manually entering listings data
(Oppliger Dep. 75:14-76:1.)  But, the PowerListings service

generated "zero calls, zero inquiries, or zero leads from all these directories." (Id. at 76:2-4; accord Def.'s Loc. R. 56.1 Statement ¶ 21.)  In subscribing to PowerListings, Oppliger planned to get listed on additional directories and see if it generated more leads. (Oppliger Dep. at 83:10-18; Def.'s Loc. R. 56.1 Statement ¶ 23.)  Oppliger admitted that Yext's sales associate did not promise new leads, but that he indicated that many directories have an audience that Tropical Sails was not reaching. (Oppliger Dep. 86:8-87:7; Def.'s Loc. R. 56.1 Statement ¶ 22.)  Oppliger contends that many of the directories that the PowerListings service added Tropical Sails to failed to benefit Tropical Sails "[b]ecause those directories [are] not where the traffic comes from," so he declined to renew Tropical Sails' subscription to PowerListings in April 2014. (Oppliger Dep. at 76:20-22, 82:9-15, 83:15-18.)  Even though he decided not to renew the subscription early on, he did not seek a refund for the remainder of his already purchased one-year subscription. (Id. at 76:11-77:5.)

Yext's PowerListings Terms and Conditions include a choice-of-law provision and forum selection clause:

> This Agreement, and any disputes arising directly or indirectly from this Agreement, shall be governed and construed in accordance with the laws of the State of New York, without regard to its choice of law provisions.  Each of the Parties hereby irrevocably consents and submits to the exclusive jurisdiction of the

> state and federal courts located in New York
> County, New York for any such disputes, and
> hereby irrevocably waives any objections to
> the laying of venue in such courts.

(Pl.'s Mot. for Class Certification Ex. 33 ¶ 9.8.)

## II.  Procedural History

Tropical Sails filed a class action complaint against Yext on September 18, 2014, invoking this Court's jurisdiction under the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1332(d). (Compl. ¶ 9.)  In its complaint, Tropical Sails seeks to recover against Yext for fraud/fraudulent inducement, unjust enrichment, and violations of N.Y. General Business Law §§ 349-50.  Yext moved to dismiss all four counts.  On May 18, 2015, this Court granted Yext's motion to dismiss in part, dismissing Tropical Sails' counts for violations of N.Y. General Business Law §§ 349-50 for failure to state a claim on which relief can be granted. (Op. & Order, ECF No. 24 (filed May 18, 2015).)

At base, Tropical Sails' surviving counts of fraud/fraudulent inducement and unjust enrichment assert that Yext's PowerListings scan's results page misleadingly inflates the total number of "Location Data Errors Detected" for a business by counting the "not standing out" and "unverified business" categories as "errors" and multiplying these errors across a legion of insignificant online business directories.

11

The parties commenced discovery focused on matters relevant to Tropical Sails' motion for class certification. (Case Management Order #1, ECF No. 33 (filed June 15, 2015).)

Tropical Sails moved under Federal Rule of Civil Procedure 23(a) and (b)(3) for class certification on December 15, 2015. It seeks to certify a class defined as:

> All persons residing in the United States that purchased Yext's PowerListings service after running the PowerListings Scan during the time period of:
>
> (a) November 7, 2012 and July 3, 2014, for those businesses that accessed the PowerListings Scan through paid advertising,
>
> and
>
> (b) November 30, 2012 and July 3, 2014, for those businesses that accessed the PowerListings Scan through organic contacts to Yext.com.

(Pl.'s Mot. for Class Certification 10.)  The putative class excludes "Yext and its parents, subsidiaries, affiliates, officers and directors; counsel for the putative class; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members." (Id. at 10 n.4.)

On January 22, 2016, Yext moved for summary judgment under Federal Rule of Civil Procedure 56. (Def.'s Mot. for Summ. J., ECF No. 66 (filed Mar. 11, 2016).)

Both motions were fully briefed on March 11, 2016.

### III.  Discussion

Tropical Sails moves the Court to certify a class under Federal Rule of Civil Procedure 23(b)(3).  Yext opposes class certification and moves the Court for summary judgment under Rule 56 because Tropical Sails cannot establish reliance on the alleged misrepresentation, the alleged misrepresentation did not cause Tropical Sails' loss, and Tropical Sails seeks an impossible remedy.

### A.  Yext's Motion for Summary Judgment

Yext moves the Court to grant summary judgment on three grounds.  First, it argues that Tropical Sails cannot establish reliance because, in his deposition, Oppliger could not recall seeing the total "Location Data Errors Detected" on the PowerListings scan results page and he provided reasons other than correcting errors for subscribing to PowerListings. Second, Yext argues that Tropical Sails' reliance on the misleading total of "Location Data Errors Detected" did not proximately cause Tropical Sails' loss because it did not cancel its subscription upon discovering the inflated errors.  Rather, it canceled the subscription because it failed to generate new leads.  Finally, Yext characterizes the recovery Tropical Sails seeks as rescission and argues that the parties cannot be restored to the status quo ante.  The Court denies Yext's motion for summary judgment.

### 1.  Applicable Law

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine dispute exists when the record evidence would permit a reasonable jury to decide in the nonmovant's favor. Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis., 804 F.3d 178, 186 (2d Cir. 2015).  A court ruling on a motion for summary judgment must construe the evidence in the light most favorable to the nonmoving party. Curry v. City of Syracuse, 316 F.3d 324, 329 (2d Cir. 2003).

The parties do not dispute that New York law applies to Tropical Sails' individual claims. (See Def.'s Mem. of L. in Support of Mot. for Summ. J. 8 n.1.)  A federal court sitting in diversity in New York applies New York state's choice-of-law rules. Thea v. Kleinhandler, 807 F.3d 492, 497 (2d Cir. 2015). "The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." In re Allstate Ins. Co., 81 N.Y.2d 219, 223 (1993).  The law that may apply to Tropical Sails' individual claims could be either New York law, supplied by the PowerListings Terms and Conditions, or Arizona

law, where Tropical Sails purchased its subscription.  The law governing fraud claims in these states does not conflict.

In New York, a plaintiff must establish the five elements of a fraud claim through clear and convincing evidence:  "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." <u>Crigger v. Fahnestock & Co.</u>, 443 F.3d 230, 234 (2d Cir. 2006).

A plaintiff who brings a fraud claim under Arizona law bears the same burden, although the elements are parsed differently:

> Actual fraud requires (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) his consequent and proximate injury.

<u>Day v. LSI Corp.</u>, 174 F. Supp. 3d 1130, 1152 (D. Ariz. 2016) (citing <u>Moore v. Meyers</u>, 253 P. 626, 628 (Ariz. 1927)).

For ease of administration, when there is no conflict, New York applies its law as the forum state. <u>Wall v. CSX Transp.</u>, 471 F.3d 410, 422-23 (2d Cir. 2006).

15

## 2.   A Genuine Dispute Exists As to Material Facts Over Tropical Sails' Reliance on the Misrepresentation

Yext points out that, at his deposition, Oppliger twice stated that he did not recall whether the PowerListings scan's result page summed up a total of location data errors. (Oppliger Dep. 61:2-5, 66:1-4.)  Yext argues that Tropical Sails cannot rely on a misrepresentation that it cannot remember.  In support of its position, Yext cites Pooshs v. Phillip Morris USA, Inc., 904 F. Supp. 2d 1009, 1027 (N.D. Cal. 2012), Last Atlantis Capital LLC v. AGS Special Partners, 749 F. Supp. 2d 828, 836 (N.D. Ill. 2010), and In re Access Cardiosystems, Inc., 404 B.R. 593, 650 (Bankr. D. Mass. 2009), aff'd, 488 B.R. 1 (D. Mass. 2012).  These cases illustrate the uncontroversial principle that a plaintiff cannot rely on a misrepresentation he does not know about.  In each of these cases, the party's failed memory undermined whether the party encountered the misrepresentation at all.  See Pooshs, 904 F. Supp. 2d at 1027 ("Plaintiff alleges in the complaint that 'the public' was misled by the [statement], but not that she herself was misled by it.  Nor did she testify that she ever saw it, read it, heard about it, or relied on it."); Last Atlantis, 749 F. Supp. 2d at 836 (granting summary judgment against one plaintiff who could not remember viewing a website at all); In re Access Cardiosystems, Inc., 404 B.R. at 650 ("Most importantly, where a plaintiff [bases] a

claim for fraud on a written statement, the plaintiff cannot successfully demonstrate any reliance without first establishing that the plaintiff actually read the allegedly false or misleading statement.")

Here, there can be no dispute that, prior to subscribing to PowerListings, Tropical Sails encountered the PowerListings scan that showed a total of "Location Data Errors Detected," which counted "not standing out" and "unverified business" as errors multiple times. (See Pl.'s Mot. for Class Certification Ex. 29 ¶ 2 (stipulating that "[a]ll persons who reached the free scan on Yext.com organically (that is, they reached Yext.com through a means other than a hyperlink provided as part of paid advertising on a third-party website) saw [a total number of 'Location Data Errors Detected'] between November 30, 2012, and July 3, 2014."); id. Ex. 16 (showing Tropical Sails ran the PowerListings scan eight times between December 4, 2012, and when it subscribed on January 14, 2014).)

Moreover, the record demonstrates that these reported errors concerned Tropical Sails.  Oppliger testified that, prior to subscribing to PowerListings, he ran the scan several times because he made corrections to several of Tropical Sails' listings and he wanted to see if these corrections showed up in the PowerListings scan. (Oppliger Dep. 64:3-18.)  He also testified that he waited to subscribe to PowerListings until he

17

spoke to a Yext sales associate because he saw the PowerListings scan's results page and he "had questions about it." (<u>Id.</u> at 98:10-21.)  He also testified that he asked the sales associate why the errors continued to show in the PowerListings scan even though he made manual corrections. (<u>Id.</u> at 65:3-11.)  Finally, Oppliger testified that "the existence of all those errors" induced him to subscribe to PowerListings. (<u>Id.</u> at 98:22-25.) The summary judgment record establishes that Tropical Sails encountered the alleged misrepresentation and the circumstances surrounding Tropical Sails' decision to subscribe to PowerListings create at least a genuine dispute over whether Tropical Sails' relied on the total "Location Data Errors Detected" misrepresentation.

Similarly, simply because Tropical Sails provided multiple reasons for subscribing to PowerListings does not establish as a matter of law that it did not rely on Yext's misrepresentation as to the total of "Location Data Errors Detected" when subscribing to PowerListings.  In New York, a misrepresentation need be only a substantial factor or an inducing cause of the plaintiff's loss. <u>See</u> <u>Curiale v. Peat, Marwick, Mitchell & Co.</u>, 214 A.D.2d 16, 27 (1st Dep't 1995) ("The representations need not have been the <u>exclusive</u> cause of plaintiff's action in entering the agreement; it is sufficient that they were a substantial factor in inducing the plaintiff to act the way it

did." (emphasis in original) (citing <u>State St. Tr. Co. v. Ernst</u>,
278 N.Y. 104, 122 (1938) ("The fraudulent misrepresentations on
the part of defendants need not be the sole inducing cause of
the damage.  It is sufficient if such representations be an
inducing cause."))).[2]  Yext argues that Oppliger testified that
Tropical Sails subscribed to PowerListings for three reasons:
(1) the ability to post pictures across multiple directories;
(2) listing Tropical Sails on directories where it did not
currently appear; and (3) saving Tropical Sails time from
manually managing each listing. (Oppliger Dep. 69:6-14; <u>accord</u>
Def.'s Loc. R. 56.1 Statement ¶ 18.)  Yext contends that none of
these reasons relate to total "Location Data Errors Detected"
misrepresentation.  Tropical Sails counters that Oppliger
specifically testified that "the existence of all those errors"
induced him to subscribe to PowerListings. (Oppliger Dep. at
98:22-25.)  Tropical Sails also argues that saving time directly
relates to error correction, because Oppliger explained that
prior to subscribing to PowerListings he manually managed
Tropical Sails' listings for one to two hours per week. (<u>Id.</u> at
35:3-37:6; Def.'s Loc. R. 56.1 Statement ¶ 10.)

---

[2]  The substantial factor test is applied under Arizona law as
well. <u>See</u> <u>Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.</u>, 30 F.
Supp. 2d 1182, 1198 (D. Ariz. 1998).

The Court agrees that Oppliger's statements regarding error correction sufficiently demonstrate that there is a genuine dispute as to whether the total of errors reported on the PowerListings scan's results page was a substantial factor in Tropical Sails' decision to subscribe to PowerListings. Accordingly, summary judgment is inappropriate on this ground.

### 3.   A Genuine Dispute Exists As to Material Facts Addressing Whether Yext's Misrepresentation Proximately Caused Tropical Sails' Loss

There is also a genuine dispute over whether Yext's alleged misrepresentation proximately caused Tropical Sails' loss.

A New York common law fraud claim requires that the injury be "the natural and probable consequence of the defrauder's misrepresentation" or that "the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 105 (2d Cir. 2001) (quoting Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1044 (2d Cir. 1986)).[3]

Yext argues that PowerListings delivered all of the services that Tropical Sails wanted it for:  it posted Tropical Sails' pictures across its partner directories, it added Tropical Sails' listing to directories where Tropical Sails was

---

[3]  Arizona law does not conflict. Med. Lab. Mgmt. Consultants, 30 F. Supp. 2d at 1198; Restatement (Second) of Torts § 548A (1965).

absent, and it saved Tropical Sails time. (Oppliger Dep. 75:14-
76:1.)  According to Yext, Tropical Sails did not cancel its
subscription because it learned that the PowerListings scan
inflated the total "Location Data Errors Detected."  Instead,
Oppliger testified that he canceled his PowerListings
subscription based on a service not offered by PowerListings:
it generated "zero calls, zero inquiries, or zero leads from all
these directories." (Id. at 76:2-4; see also id. at 86:8-87:7;
Def.'s Loc. R. 56.1 Statement ¶¶ 21-22.)

     Yext's argument about proximate cause is not much different
from its argument about reliance, and the same genuine dispute
as to material facts makes summary judgment inappropriate here.
While it is true that, in subscribing to PowerListings, Tropical
Sails planned to get listed on additional directories and see if
it generated more leads, (Oppliger Dep. at 83:10-18; Def.'s Loc.
R. 56.1 Statement ¶ 23), Oppliger also testified that Yext's
sales associate sold him on a PowerListings subscription because
PowerListings would help with Tropical Sails' search engine
optimization by ensuring Tropical Sails' "listings will be
correct.  You'll have the pictures, and the description will
have more weight than just a plain [one]." (Id. at 66:21-67:6;
accord id. 67:19-22; Def.'s Loc. R. 56.1 Statement ¶ 17.)  If a
reasonable jury could conclude that the total "Location Data
Errors Detected" misrepresentation was a substantial factor in

Tropical Sails' purchase of a PowerListings subscription, so too
could it conclude that the purchase of a subscription was the
natural and probable consequence of the misrepresentation.
Accordingly, summary judgment is inappropriate on this ground as
well.

### 4.   The Remedy Tropical Sails Seeks Is Not Impossible

Tropical Sails seeks monetary damages for Yext's alleged
fraudulent inducement.  The measure of damages in a New York
common law action in fraud "is indemnity for the actual
pecuniary loss sustained as the direct result of the wrong,"
also known as the "out of pocket" rule. Lama Holding Co. v.
Smith Barney Inc., 88 N.Y.2d 413, 421 (1996) (quoting Reno v.
Bull, 226 N.Y. 546, 553 (1919)).  The out of pocket rule
computes loss by determining the difference between the value of
the bargain that a plaintiff induced by fraud made and the value
of the consideration paid as the price of the bargain.
Continental Casualty Co. v. PricewaterhouseCoopers, LLP, 15
N.Y.3d 264, 271 (2010).  Tropical Sails contends that it is
entitled to the full price of its one-year subscription, $499.

Yext contends that Tropical Sails' claim that it is
entitled to the full subscription price is really a claim for
rescission, and that rescission is not appropriate here because
the parties cannot be restored to the status quo ante.  In other
words, Yext takes the position that because Tropical Sails

22

received the benefit of a full year subscription to PowerListings, and this benefit cannot be returned, the transaction cannot be unwound.

Nowhere in its complaint does Tropical Sails state that it seeks to rescind the transaction with Yext. Rescission is an equitable remedy "to be invoked only when there is lacking complete and adequate remedy at law and where the status quo may be substantially restored." Rudman v. Cowles Commc'ns, Inc., 30 N.Y.2d 1, 13 (1972). Money damages, which Tropical Sails does seek, is an adequate remedy at law here. The Court does not disagree with Yext's premise that Tropical Sails received the benefit of a year of PowerListings and that this benefit cannot be returned to Yext. But the out of pocket rule accounts for this benefit.

At summary judgment, Tropical Sails need only raise a genuine issue of material fact as to the existence of alleged damages. See V.S. Int'l S.A. v. Boyden World Corp., No. 90 Civ. 4091 (PKL), 1993 WL 59399, at *7 (S.D.N.Y. Mar. 4, 1993). Whatever the amount of damages—$499 or some lesser amount, subtracting whatever a jury finds to be the actual value of the PowerListings service—is for Tropical Sails to prove at trial. At this stage, there is no dispute that Tropical Sails paid $499 for a subscription to PowerListings. Because a reasonable jury could conclude on the summary judgment record that Tropical

Sails relied on Yext's total "Location Data Errors Detected" misrepresentation to subscribe to PowerListings, a genuine dispute exists as to existence of damages.  Accordingly, summary judgment is inappropriate on this ground as well.[4]

> ### B.  Tropical Sails' Motion for Class Certification

Tropical Sails seeks to certify a class defined as:

> All persons residing in the United States that purchased Yext's PowerListings service after running the PowerListings Scan during the time period of:
>
> (a) November 7, 2012 and July 3, 2014, for those businesses that accessed the PowerListings Scan through paid advertising,
>
> and
>
> (b) November 30, 2012 and July 3, 2014, for those businesses that accessed the PowerListings Scan through organic contacts to Yext.com.

(Pl.'s Mot. for Class Certification 10.)  Tropical Sails contends that it meets the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3), so that this case should proceed as

---

[4]  Arizona law does not conflict.  Arizona law allows a plaintiff to elect rescission or affirm the contract and seek monetary damages. Jennings v. Lee, 461 P.2d 161, 165 (Ariz. 1969) (en banc).  As discussed, Tropical Sails did not elect rescission. To the extent, if at all, that Arizona law would measure damages differently, see Ashley v. Kramer, 442 P.2d 564, 568 (Ariz. 1968) ("We hold that 'consequential damage' is a proper measure of damages in a fraud action and that the defrauding party may not limit the proof of damages to the benefit of the bargain, a type of proof which at times may be difficult to present."), no conflict exists at summary judgment because Tropical Sails need not prove the amount of damages at this stage.

a class action.  The Court denies the motion for class
certification because individual questions of law and fact
predominate here.

## 1.  Applicable Law

Federal Rule of Civil Procedure 23(a) permits one or more
members of a class to sue as representative parties on behalf of
all members only if:

> (1)  the class is so numerous that joinder of
> all members is impracticable;
>
> (2)  there are questions of law or fact common
> to the class;
>
> (3)  the claims or defenses of the
> representative parties are typical of the
> claims or defenses of the class; and
>
> (4)  the representative parties will fairly
> and adequately protect the interests of
> the class.

Fed. R. Civ. P. 23(a).  The Second Circuit also recognizes an
"implied requirement of ascertainability" in subparagraph (a).
Brecher v. Rep. of Arg., 806 F.3d 22, 24 (2d Cir. 2015).  "A
class is ascertainable when defined by objective criteria that
are administratively feasible and when identifying its members
would not require a mini-hearing on the merits of each case."
Id. at 24-25 (quoting Charron v. Pinnacle Grp. N.Y. LLC, 269
F.R.D. 221, 229 (S.D.N.Y. 2010)).

If Rule 23(a) is satisfied, a class action may be
maintained under subparagraph (b)(3) if

the court finds that the questions of law or
fact common to class members predominate over
any questions affecting only individual
members, and that a class action is superior
to other available methods for fairly and
efficiently adjudicating the controversy. The
matters pertinent to these findings include:

(A)   the class members' interests in
      individually controlling the prosecution
      or defense of separate actions;

(B)   the extent and nature of any litigation
      concerning the controversy already begun
      by or against class members;

(C)   the desirability or undesirability of
      concentrating the litigation of the
      claims in the particular forum; and

(D)   the likely difficulties in managing a
      class action.

Fed. R. Civ. P. 23(b)(3). While the four factors set forth in

Rule 23(b)(3) structurally "apply to both predominance and

superiority, they more clearly implicate the superiority

inquiry." Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 82

(2d Cir. 2015). Even further, "manageability 'is, by the far,

the most critical concern in determining whether an action is a

superior means of adjudication.'" Id. (quoting 2 William B.

Rubenstein, Newberg on Class Actions § 4.72 (5th ed. West

2014)).

     The party seeking class certification bears the burden of

establishing by a preponderance of evidence that each of Rule

26

23's requirements have been met. Johnson v. Nextel Commc'ns
Inc., 780 F.3d 128, 137 (2d Cir. 2015).

## 2. Tropical Sails Has Shown by a Preponderance of Evidence That This Action Meets the Requirements of Federal Rule of Civil Procedure 23(a)

Yext does not dispute that the class that Tropical Sails
seeks to certify is ascertainable or numerous.  The Court treats
those prerequisites briefly here.

### a. Ascertainability

Tropical Sails contends that the class can be ascertained
through objective criteria because Yext maintains detailed
records on all current and past customers including the date the
customer ran the PowerListings scan, subscribed to
PowerListings, and how the customer accessed the PowerListings
scan (i.e., through paid advertising or by other means).  The
uncontroverted existence of these records makes the
ascertainability of the class administratively feasible and
should not require mini-hearings on the merits of each member's
claims.  The class is ascertainable.

### b. Numerosity

Tropical Sails contends that the class consists of over
35,000 members:  more than 18,300 computer sales and more than
16,700 sales through Yext sales associates.  It derives this
number from Yext's Monthly PowerListings Sales Chart.  In the
Second Circuit, courts presume numerosity at forty members.

27

Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d
Cir. 1995).  The class is sufficiently numerous.

c.  Common Questions of Law or Fact

The Rule 23(a) prerequisite that there be questions of law
or fact common to the class "requires the plaintiff to
demonstrate that the class members 'have suffered the same
injury.'" Wal-Mart Stores v. Dukes, 564 U.S. 338, 350 (2011)
(quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157
(1982)).  To do so, a class representative must show that the
class members' claims depend upon a common contention that is
capable of classwide resolution, or in other words, that
determination of the contention's truth or falsity "will resolve
an issue that is central to the validity of each one of the
claims in one stroke." Id.

Tropical Sails identifies five questions it contends are
common to the class.  Three questions of fact:  (1) whether Yext
engineered its scan during the class period to always denote
numerous "location errors" if the business being scanned was not
already a PowerListings customer; (2) whether Yext engineered
its scan during the class period to always show a "location
error" for "not standing out" if the business being scanned was
not already a PowerListings customer; and (3) whether Yext
engineered its scan during the class period to always show a
"location error" under the "Status" column if the business was

28

not already a PowerListings customer.  And two questions of law:
(4) whether the class members were fraudulently induced to
purchase PowerListings and (5) whether Yext was unjustly
enriched.

    The questions of fact that Tropical Sails identifies are
common to the class.  These three questions may be grouped
together to ask simply:  Did Yext's PowerListings scan's results
page manufacture errors for nonsubscribers?  The answer to this
question can resolve an issue central to all members' claims of
fraud and unjust enrichment in one stroke.  Whether Tropical
Sails' common questions of law can be resolved in one stroke, by
contrast, is less straightforward (as the Court discusses in
greater detail in its Rule 23(b)(3) predominance analysis).  For
the purposes of Rule 23(a), however, because "even a single
common question will do," Wal-Mart Stores, 564 U.S. at 359
(alterations omitted), Tropical Sails establishes commonality.

### d.  Typicality

    Even though the commonality and typicality requirements
"tend to merge" because they both "serve as guideposts for
determining whether under the particular circumstances
maintenance of a class action is economical and whether the
named plaintiff's claim and the class claims are so interrelated
that the interests of the class members will be fairly and
adequately protected in their absence," Wal-Mart Stores, 564

U.S. at 349 n.5 (quoting Falcon, 457 U.S. at 157–58 n.13), these
requirements are distinct insofar as typicality focuses on
"claims or defenses" while commonality looks for "questions of
law or fact." Fed. R. Civ. P. 23(a)(2)-(3); accord Madden v.
Midland Funding, LLC, No. 11 Civ. 8149 (CS), — F. Supp. 3d —,
2017 WL 758518, at *15 (S.D.N.Y. Feb. 27, 2017).  A plaintiff
satisfies typicality "when each class member's claim arises from
the same course of events, and each class member makes similar
legal arguments to prove the defendant's liability." Brown v.
Kelly, 609 F.3d 467, 475 (2d Cir. 2010) (quoting Marisol A. v.
Giuliani, 126 F.3d 372, 376 (2d Cir. 1997)).

Yext contends that Tropical Sails' claims and Yext's
defenses to those claims are atypical of the class because
Oppliger could not remember encountering the total "Location
Data Errors Detected" on the PowerListings scan's results page,
Tropical Sails subscribed to PowerListings only after a follow-
up sales call, and Tropical Sails received other benefits from
the PowerListings service.  These discrepancies are not
disqualifying because they fail to show a different course of
events or dissimilar legal arguments between Tropical Sails and
the proposed class.

First, as discussed above, Oppliger's failed memory does
not as a matter of law preclude a determination that he relied
on Yext's alleged misrepresentation.  Second, Yext agrees that,

during the class period, every person who ran the PowerListings
scan encountered the total "Location Data Errors Detected" on
the PowerListings scan's results page. (Pl.'s Mot. for Class
Certification Ex. 29 ¶ 2 (stipulating that for the dates
defining the class period "[a]ll persons" encountered a total
number of "Location Data Errors Detected"). Yext does not
explain why the fact that some subset of the class may have also
had a sales call with a Yext sales associate would alter the
reliance of that subset on the misrepresentation that every
member encountered. Third, the other benefits available to
Tropical Sails are characteristic of the PowerListings service
and, by design, available to other class members as well.

Tropical Sails' claims are typical of the claims of the
class because the class definition seeks to isolate those class
members who ran the same version of the PowerListings scan as
Tropical Sails, who encountered the alleged misrepresentation of
a total number of "Location Data Errors Detected," and who
relied on this misrepresentation when purchasing a PowerListings
subscription. Although each class member's exact course of
conduct may contain variations within this general outline,
Tropical Sails has shown by a preponderance of evidence that
these variations are not of the type that would alter the course
of events or lead to dissimilar claims or defenses.
Accordingly, Tropical Sails' claims are typical of the class.

31

                    e.   Adequacy of Representation

     Tropical Sails and its counsel, Carney, Bates & Pulliam,
PCCL, are adequate representatives for the proposed class.  The
requirement that a named plaintiff and its counsel be adequate
representatives for the class asks courts to determine whether
"1) plaintiff's interests are antagonistic to the interest of
other members of the class and 2) plaintiff's attorneys are
qualified, experienced and able to conduct the litigation." In
re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d
Cir. 2009) (quoting Baffa v. Donaldson, Lufkin & Jenrette Sec.
Corp., 222 F.3d 52, 60 (2d Cir. 2000)).  To defeat a motion for
class certification, the conflict must be fundamental. Id.

     Yext does not challenge the adequacy of representation by
Tropical Sails' counsel and the firm's proffered résumé suggests
that it is well-qualified, experienced, and able class counsel.

     Yext groups its challenge to Tropical Sails' adequacy of
representation with its typicality challenge.  Tropical Sails'
receipt of a follow up sales call, Oppliger's failed memory, and
the availability of other benefits do not create conflicts of
interest between Tropical Sails and other class members.
Accordingly, Tropical Sails and its counsel are adequate
representatives of the class.

                                 32

### 3.   Tropical Sails Has Failed to Show by a Preponderance of Evidence That This Action Meets the Requirements of Federal Rule of Civil Procedure 23(b)(3)

Tropical Sails' proof that it meets the Rule 23(a) prerequisites is not itself sufficient to warrant class certification.  Tropical Sails must also show that the class is of one of the types set forth in Rule 23(b).  Tropical Sails asserts that the proposed class meets Rule 23(b)(3)'s predominance and superiority requirements.  The Court declines to certify a class because individual questions of fact predominate here.

#### a.  Applicable Law

Whether questions of law or fact common to class members predominate over any questions affecting only individual members "begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011).

Unlike Tropical Sails' individual claims, as concerns a nationwide class, the parties dispute whether the contractual choice-of-law provision in the PowerListings Terms and Conditions governs or New York's interests analysis would apply, which could lead to application of the law of multiple states.

In general, New York courts are reluctant "to construe contractual choice-of-law clauses broadly to encompass extra-

33

contractual causes of action." Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 334 (2d Cir. 2005). In Finance One Public Co., the Second Circuit held that "tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract." Id. at 335. The court presumed that "a contractual choice-of-law clause could be drafted broadly enough to reach such tort claims," id., but at the time of its decision it could identify "no reported New York cases present[ing] such a broad clause." Id. At least one subsequent reported case has found a clause broad enough to encompass tort claims, see Capital Z Fin. Servs. Fund II, L.P. v. Health Net, Inc., 43 A.D.3d 100, 109 (1st Dep't 2007), but the Capital Z court's reasoning has been questioned based in part on its reliance on Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309-10 (2d Cir. 1994), which applied Texas choice-of-law rules to a contract. See McBeth v. Porges, 171 F. Supp. 3d 216, 224 n.3 (S.D.N.Y. 2016). The Capital Z court's determination was also not essential to its holding. Id.; Capital Z, 43 A.D.3d at 100 (holding that the claims at issue were properly dismissed under either Delaware law, as provided by the choice-of-law provision, or New York law).

In addition, "[s]ome controversy appears to exist as to whether a claim for unjust enrichment is governed by a

contract's enforceable choice-of-law provision, or whether it is instead governed by the law of the state that New York's interests analysis yields, being a fundamentally non-contractual cause of action." 2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co., 96 F. Supp. 3d 182, 233 (S.D.N.Y. 2015) (collecting and comparing cases).  "If anything can be gleaned from the conflicting case law . . . , it is that the more an unjust enrichment claim relates to an enforceable contract, the more likely it is to be considered contractual in nature for the purposes of New York's choice-of-law analysis." Id.  Some courts have applied the same broadness inquiry used in tort claims incident to a contract to quasi-contractual claims. See CUnet, LLC v. Quad Partners, LLC, No. 16 Civ. 6327 (CM), 2017 WL 945937, at *6 (Mar. 7, 2017) (declining to apply a contractual choice-of-law provision that was "insufficiently broad"); Dart Brokerage Corp. v. Am. Commerce Ins. Co., No. 13 Civ. 4015 (LGS), 2013 WL 5966901, at *2 (S.D.N.Y. Nov. 7, 2013) (same); Gustadt v. Nat'l Fin. Partners Corp., Index. No. 158257/2012, slip op. at 5 (N.Y. Sup. Ct. (N.Y. Cty.) Oct. 22, 2013) (same).

Ultimately, with regards to the tort of fraud, the answer to the question of whether to apply New York law or the law of other states is inconsequential because the Court concludes that Tropical Sails cannot show reliance—a core element of common law

35

fraud in any jurisdiction—by common proof. See Spencer v.
Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 301 (D. Conn.
2009) ("Virtually every state requires that . . . the plaintiff
relied on the statement."). Thus, class certification would be
inappropriate for Tropical Sails' common law fraud claim no
matter what state's law applied.

Similarly, with regards to the quasi-contractual claim for
unjust enrichment, the Court concludes that Tropical Sails
cannot show by common proof that it would be against equity and
good conscience to permit the defendant to retain what is sought
to be recovered.  The Court the applies contractual choice-of-
law provision's selection of New York law to the unjust
enrichment claim here, because the unjust enrichment claim
arises from the payment conferred on Yext for its PowerListings
service, which sounds more in contract than in tort, see Feiger
v. Pitney Bowes Credit Corp., 251 F.3d 386, 394 (2d Cir. 2001).
Nevertheless, if the law of multiple states applied to the
unjust enrichment claim, that alone may defeat certification of
Tropical Sails' proposed nationwide class. See Hughes v. The
Ester C Co., 317 F.R.D 333, 353 (E.D.N.Y. 2016); Spencer, 256
F.R.D. at 304-305.

b.  Individual Questions of Fact Predominate
Tropical Sails' Fraud Claim

The Court concludes that individual questions of fact
predominate Tropical Sails' fraud claim because Tropical Sails
has not shown that reliance on the total "Location Data Errors
Detected" misrepresentation is capable of common proof.

Proving reliance using generalized proof can be difficult.
See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-
Aventis U.S. LLP, 806 F.3d 71, 87 (2d Cir. 2015).  But "[i]n
certain factual contexts," a plaintiff "may be able to prove
class-wide causation . . . if 'circumstantial evidence'
generates a sufficiently strong inference that all class members
did, in fact, rely."  Id. at 88.  For example, in In re U.S.
Foodservice Inc. Pricing Litigation, 729 F.3d 108, 119-20 (2d
Cir. 2013), the Second Circuit concluded that where class
members asserted that they were victims of fraudulent
overbilling, "payment may constitute circumstantial proof of
reliance based on the reasonable inference that customers who
pay the amount specified in an inflated invoice would not have
done so absent reliance upon the invoice's implicit
representation that the invoiced amount was honestly owed."  Id.
at 120.  Similarly, in Ge Dandong v. Pinnacle Performance Ltd.,
No. 10 Civ. 8086 (JMF), 2013 WL 5658790, at *10 (S.D.N.Y. Oct.
17, 2013), the court concluded that the purchase of credit-

linked notes "were not the type of product that individuals purchase for 'any number of reasons,'; they were financial investments that Plaintiffs made in hopes that they would prove profitable." Id. (citation omitted).  Thus, the court drew a reasonable inference of reliance where "the alleged misrepresentations and omissions . . . were so fundamental to the value of the Notes that it is hard to imagine a reasonable investor purchasing them." Id.  Similarly, in Spencer, 256 F.R.D. 284, the court ruled that reliance could be proven through class members' acceptance of sufficiently uniform written structured settlements because, even though plaintiffs may have accepted the settlement for different reasons, "it is equally clear that every plaintiff to whom a total dollar figure was represented relied on that dollar figure in deciding whether to accept the settlement." Id. at 303; accord Seekamp v. It's Huge, Inc., 1:09 Civ. 18 (LEK/DRH), 2012 WL 860364, at *10 (N.D.N.Y. Mar. 13, 2012) (using similar language where class members purchased an illegal contract that defendants misrepresented as legal).

The Second Circuit has cautioned, however, that "a financial transaction does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase." McLaughlin v. Am. Tobacco, Co., 522 F.3d 215, 225 n.7 (2d Cir. 2008), abrogated on other grounds by Bridge v. Phx.

38

Bond & Indem. Co., 553 U.S. 639 (2008).  In McLaughlin, the
Second Circuit decertified a class that asserted that
manufacturers of light cigarettes misrepresented the health
benefits of their product because "each plaintiff in this case
could have elected to purchase light cigarettes for any number
of reasons, including a preference for the taste and a feeling
that smoking Lights was 'cool.'" Id. at 225; accord In re Grand
Theft Auto Video Game Consumer Litig., 251 F.R.D. 139, 155
(S.D.N.Y. 2008) (denying class certification addressed to a
video game's misleading content rating because consumers could
have purchased the video game for any number of reasons).

    Tropical Sails contends that its class squares with the
class certified in Rodriguez v. It's Just Lunch, Int'l, 300
F.R.D. 125, 139-40 (S.D.N.Y. 2014).  In It's Just Lunch, a
dating service represented to all applicants that it had at
least two matches in mind during an intake interview,
notwithstanding that the dating service accepted all applicants
as customers. Id. at 139.  The court concluded that this
misrepresentation was sufficiently fundamental to the service to
permit the reasonable inference that class members relied on it
in becoming customers.  The court pointed to evidence that
suggested that even the dating service viewed the
misrepresentation as fundamental, because it directed sales
associates not to deviate from the misrepresentation and to

pitch the sale immediately after making the misrepresentation.
Id. at 139-40.  The court concluded that it was "hard to imagine
a reasonable consumer," who had sought out the dating service to
set him up with compatible matches, not being swayed in some
degree by a dating service "touting its supposed matches." Id.
at 140.

The decision to subscribe to PowerListings is not "the same
more-or-less one-dimensional decisionmaking process," Sergeants
Benevolent Ass'n Health & Welfare Fund, 806 F.3d at 88, as the
financial transactions in U.S. Foodservice, Spencer, or Ge
Dandong, the illegal contract in Seekamp, or dating service in
It's Just Lunch.  Rather, a business that chooses to subscribe
to PowerListings engages in an idiosyncratic personal choice
that may be based on any number of reasons.  PowerListings is
"enhanced local listings on participating local search, mobile
and directory sites." (Pl.'s Mot. for Class Certification Ex. 1,
at YEXT0000017.)  Subscribers may decide to purchase
PowerListings for any number of reasons including any one of the
"three primary benefits" of PowerListings that Yext identifies
like the ability to manage, update, and edit listings on
multiple directories at one time from one location, the ability
to add photos, videos, and special offers to listings, and the
higher visibility of a subscriber's listing to its potential
customers. (Id. at YEXT0000017, 31, 52, 55, 174; id. Ex. 17, at

40

YEXT0000769.)  Error correction may not matter to newly created
businesses, businesses new to the internet, or businesses with
already strong search engine optimization who find appealing
PowerListings' single point control, smartphone app, or enhanced
content.  Likewise, the Court is "not blind to the indeterminate
likelihood that . . . some members of the plaintiffs' desired
class were aware" of the alleged inaccuracy of the total
"Location Data Errors Detected," given the enumerated list of
directories and links to the listings, "and they therefore could
not have relied on the defendants' marketing in deciding to
purchase [PowerListings]." McLaughlin, 522 F.3d at 225 (emphasis
in original); (cf. Oppliger Dep. 64:12-65:11.)

Tropical Sails has failed to show that individual issues of
reliance would not overwhelm the class because Tropical Sails
has not identified circumstantial evidence from which it is
reasonable to infer each class member's reliance.

c.  Individual Questions of Fact Predominate Tropical Sails'
Unjust Enrichment Claim

Similarly, Tropical Sails cannot show that common questions
of law or fact predominate its unjust enrichment claim.

An unjust enrichment claim in New York requires a plaintiff
to show "that (1) the other party was enriched, (2) at that
party's expense, and (3) that 'it is against equity and good
conscience to permit [the other party] to retain what is sought

41

to be recovered." <u>Mandarin Trading Ltd. v. Wildenstein</u>, 16

N.Y.3d 173, 182 (2011) (alteration in original) (quoting

<u>Citibank, N.A. v. Walker</u>, 12 A.D.3d. 480, 481 (2d Dep't 2004)).

"The essential inquiry in any action for unjust enrichment

. . . is whether it is against equity and good conscience to

permit the defendant to retain what is sought to be recovered."

<u>Id.</u> (omission in original) (quoting <u>Paramount Film Distrib.</u>

<u>Corp. v. New York</u>, 30 N.Y.2d 415, 421 (1972)).

Tropical Sails contends that "the predominant issue for

[its] unjust enrichment claim is whether Yext was enriched at

the Class's expense by using a deceptive Scan to induce the

purchase of Yext's PowerListings service." (Pl.'s Mem. of L. in

Support of Mot. for Class Certification 22.)  Much like reliance

on the misrepresentation, the idiosyncratic personal choice of

each business that purchases a PowerListings subscription

obfuscates any classwide resolution of whether the PowerListings

scan induced any individual class member's purchase and,

therefore, "whether it is against equity and good conscience to

permit" Yext to retain what is sought to be recovered. <u>See</u> <u>Crab</u>

<u>House of Douglaston Inc. v. Newsday, Inc.</u>, No. 04 Civ. 558

(DRH)(WDW), 2013 WL 1338894, at *14 (E.D.N.Y. Mar. 29, 2013)

(denying class certification for unjust enrichment where "issues

surrounding whether [the defendant] benefitted at the expense of

commercial advertisers will be based on the circumstances of

each commercial advertiser"); <u>Weiner v. Snapple Bev. Corp.</u>, No. 07 Civ. 8742 (DLC), 2010 WL 3119452, at *11 (S.D.N.Y. Aug. 5, 2010) (denying class certification for unjust enrichment where individualized inquiries to determine "whether the benefits that putative class members received were 'less than what they bargained for'" would "dwarf" common questions of law or fact).

Like its fraud claim, with regards to its unjust enrichment claim, Tropical Sails has failed to show that the circumstances surrounding each class member's purchase of a PowerListings subscription would not overwhelm the class because Tropical Sails has not identified that each class member's reasons for purchasing PowerListings are capable of common proof.

**4.  The Court Retains Jurisdiction Over Tropical Sails' Action**

Although the Court denies Tropical Sails' motion for class certification, this decision does not strip the Court's jurisdiction over Tropical Sails' individual claims.

The Second Circuit has not addressed whether a federal court retains jurisdiction over an individual claim originally brought as a putative class action under CAFA.  The six circuit courts that have considered the issue have all concluded that a decision denying certification does not eliminate federal jurisdiction over the original claims. <u>See</u> <u>Louisiana v. Am. Nat'l Prop. Cas. Co.</u>, 746 F.3d 633, 635 (5th Cir. 2014); <u>Metz v. Unizan Bank</u>, 649 F.3d 492, 500-01 (6th Cir. 2011); <u>Buetow v.</u>

43

A.L.S. Enters., Inc., 650 F.3d 1178, 1182 n.2 (8th Cir. 2011);

United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied

Indus. & Serv. Workers Int'l Union v. Shell Oil Co., 602 F.3d

1087, 1091-92 (9th Cir. 2010); Cunningham Charter Corp. v.

Learjet, Inc., 592 F.3d 805, 806-07 (7th Cir. 2010); Vega v. T-

Mobile USA, Inc., 564 F.3d 1256, 1268 n.12 (11th Cir. 2009).

And district courts in this Circuit have followed suit. Fleisher

v. Phx. Life Ins. Co., 997 F. Supp. 2d 230, 238-40 (S.D.N.Y.

2014); In Touch Concepts, Inc. v. Cellco P'ship, 949 F. Supp. 2d

447, 462-63 (S.D.N.Y. 2013); Abraham v. Am. Home Mortg.

Servicing, Inc., 947 F. Supp. 2d 222, 232-33 (E.D.N.Y. 2013);

Certain Underwriters at Lloyd's of London v. Ill. Nat'l Ins.

Co., No. 09 Civ. 4418 (LAP), 2012 WL 4471564, at *6 (S.D.N.Y.

Sept. 24, 2012); Weiner, 2011 WL 196930, at *2.  Of course, if a

plaintiff invoked CAFA jurisdiction frivolously or defectively,

federal jurisdiction would not exist. Fleisher, 997 F. Supp. 2d

at 239.[5]

---

[5]  The Court agrees with the Fleisher court that "[t]he notion
that plaintiffs can manufacture federal jurisdiction by making
classwide allegations that turn out not to be certifiable, for
whatever reason, is deeply troubling. . . .  Because this is an
area ripe for abuse, Congress may well wish to take a second
look at CAFA, and to make specific provision for what ought to
happen when no class is certified." Fleisher, 997 F. Supp. 2d at
239-40.

Here, while Tropical Sails' individual claims would not satisfy the jurisdictional amount under 28 U.S.C. § 1332(a)(2), the record does not suggest that Tropical Sails' invocation of CAFA jurisdiction at the outset of this suit was frivolous or defective.  Accordingly, the Court retains jurisdiction over Tropical Sails' individual claim under CAFA.

## Conclusion

Yext's motion for summary judgment as to Tropical Sails' individual claims for fraud and unjust enrichment is denied because there exist genuine disputes as to material facts regarding Tropical Sails' reliance on Yext's alleged misrepresentation, proximate causation, and damages.  Tropical Sails' motion for class certification is denied because individual questions of fact and law regarding reliance and equity and good conscience predominate any common questions. The Court retains jurisdiction over Tropical Sails' individual claims because the denial of class certification does not eliminate jurisdiction under CAFA.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 49 and 66.  The parties are directed to file those portions of previously sealed exhibits 1, 2, 12, and 17 to Tropical Sails' Motion for Class Certification relied on herein and to appear before the Court on Tuesday, April 11, 2017, at 11:00 a.m. in Courtroom 20-C for a status conference.

**SO ORDERED.**

Dated:    New York, New York
          March 17, 2017

                              John F. Keenan
                              United States District Judge